No. 12,780.

THE STATE VS. CANAL & CLAIBORNE RAILROAD COMPANY, THROUGH
JOSEPH H. DEGRANGE, PRESIDENT.

An ordinance of the City Council of the city of New Orleans which requires cor-
porations operating street electric cars within the limits of the city, upon
tracks laid down in the public streets thereof, to water their tracks so as to
effectually lay the dust within its tracks, is a legal exercise of the police power
of the city. Such an ordinance tends to promote the comfort and convenience
of passengers, and the health and comfort of the inhabitants of the city.
It is neither indefinite nor unreasonable.

ON APPEAL from the Sixth Recorder's Court of New Orleans.
Arnauld, J.

James J. McLoughlin, Assistant City Attorney, and Samuel L. Gil-
more, City Attorney, for City of New Orleans, Plaintiff and Appellee.

Clegy & Quintero for Defendant, Appellant.

Argued and submitted May 20, 1898.
Opinion handed down June 21, 1898.
Rehearing refused December 5, 1898.

Taken to Supreme Court of the United States by Writ of Error.

The opinion of the court was delivered by

WATKINS, J.   The defendant, through the instrumentality of its
president, is prosecuted upon the charge of having wilfully and
unlawfully violated City Ordinance No. 13,835, C. S., by failing to
water its tracks on Claiborne and Elysian Fields avenues and other
streets of the city which are traversed by its tracks, as required
by said ordinance.

On the trial the defendant was found guilty and sentenced to pay
a fine of twenty-five dollars, and in default of payment of the fine
he was to suffer imprisonment for a period of twenty days in the
parish prison, and from that sentence it prosecutes the present
appeal to this court.

In the recorder's court the defendant, through counsel, filed the
following demurrer to the legality of the ordinance, viz.:

1. Because the City Council was without power or right to enact such an ordinance.

2. Because the provisions of Sec. 1 of same are so indefinite and unreasonable that no person or corporation therein described is able to know what is commanded to be done in pursuance thereof.

2. Because the same is an attempt on the part of the municipal authorities to exert an unreasonable exercise of the police power, and if same be enforced it would be unequal and not uniform in its operation, "in that it compels, or would compel one class of persons using the public streets to perform a duty or service not required of other persons making a like use of the same streets."

4. Because it is unlawful and unreasonable "for the municipal authorities to transfer, or attempt to transfer a public burden to private persons or corporations; and that the aforesaid ordinance is an offer or an attempt to make certain persons or corporations perform a service or duty, which service or duty should be performed by the municipal authorities, or under their direction.

" And said ordinance does not require, or pretend to require the performance of such service or duty by all private persons or corporations in like situation."

5. Because said ordinance attempts to compel the performance of a service without adequate compensation; and if it is enforced, it will take the property and labor of a person or corporation for the benefit of the city without compensation, and without due process of law.

6. This assignment is about the same as last. The demurrer further assigns, that said ordinance is beyond the power of the City Council, and is violative of the provisions of the Constitution of the United States and of this State in this, viz.: .

That the defendant railroad company " acquired by purchase the right to run its cars on certain streets in the city of New Orleans * * * and the right to maintain and operate its lines of cars upon certain specified and agreed conditions in the contract fully expressed, and the duty or obligation to water their tracks, as provided in Sec. 1 (said ordinance), No. 13,835, C. S., * * * forms no part thereof;" and that said ordinance is an attempted impairment of their aforesaid contract rights, and if enforced it will seriously impair the same.

It further assigns, that the necessity of effectually keeping the

dust laid on lines of street car tracks, if such need there be, is one that " arises in the course of nature and is not a state or condition created or brought about by the operation of said street cars;" and consequently it is unlawful and unreasonable to impose upon a corporation operating street cars the duty of keeping the dust laid—it having no relation to the operation of the street cars under its contract.

That if it be in the interest of the public that the dust on the street car tracks be kept down, it is unlawful and unreasonable, on the part of the City Council, to require the company to perform this public service.

This extended statement of the defendant's demurrer may be abbreviated and given more concisely in the following synopsis, thus:

1. That the ordinance is indefinite and unreasonable in terms; and an unreasonable exercise of the police power of the city is thereby contemplated.

2. That it is unequal and not uniform.

3. That it transfers a public burden to private persons.

4. That it requires the performance of a service without adequate consideration, and takes private property without due process of law.

5. That it is an impairment of its contract rights, in violation of the contract clause of the Federal Constitution.

6. That dust arises in the course of nature, and is not caused or created by the operation of its cars, and, consequently, the ordinance unwarrantably and unreasonably imposes that duty upon it.

On the other hand, it is the contention of the city attorney that the City Council, in the exercise of the police power which is vested in the city of New Orleans, has the right to enact ordinances so regulating the use of streets by electric railways as to compel them to keep their tracks in such condition as to prevent a nuisance, and to protect the health, convenience and comfort of its inhabitants.

That an ordinance which requires street car corporations to water their tracks so as to effectually keep down the dust thereon is definite and reasonable, and as such it is a valid and proper exercise of the police power.

His further contention is, that the police power of a city can not be alienated or bartered away by any contract, and, consequently,

the city always retains the right to impose upon citizens and corpora-
tions—particularly upon those exercising and operating public
franchises—the duty and burden of so conducting their operation
and use as to promote the convenience and to protect the health
and the comfort of the public; and it forms a necessary incident of
the contract which is read into it.

That all persons, natural or artificial, are subject to the police
regulations of the municipality in which they live.

Two things are conspicuous upon casual inspection of the ordi-
nance, (1) that its provisions exclusively deal with corporations
operating lines of street cars within the city of New Orleans, under
franchises acquired from the City Council; (2) and does not deal
with any contract right as such corporations have acquired from the
city under their franchises.

The ordinance under consideration, confessedly and in terms, pro-
poses an exercise of the police power under municipal regulation,
and that alone.

The questions which arise are the following, viz.:

1. Is the ordinance indefinite, unreasonable, or lacking in uni-
formity?

2. Does it transfer a public burden to private individuals or per-
sons; or take property without due procecs of law, or adequate
compensation?

The ordinance is couched in the simplest form of words, viz.:

" Be it enacted, etc. That each and every company or corporation
operating street car lines within the limits of the city of New
Orleans shall water their tracks so as to effectually keep the dust on same
laid"—providing a penalty for its violation.

It is certainly neither indefinite or wanting in uniformity. It does
not propose to take the private property of the corporation without
due process of law.

After making the foregoing careful synopsis of the ordinance and
the defendant's demurrer, our conclusion is, that the two questions
for consideration are (1) whether the ordinance is unreasonable;
and (2) whether it was an attempt to place a public burden on
private persons.

We may well premise the discussion by referring to the provisions
of a prior ordinance on the same subject matter bearing the number
12,911, C. S., which was examined by this court in State vs. New

Orleans City & Lake Railroad Company, *49 An. 1571*, as that ordinance and decision will serve to illustrate the one under consideration.

It is as follows, viz. :

" *Be it enacted* that hereafter it shall be unlawful for any person, firm, or corporation to operate any electric, trolley or other cars or trains on the streets of this city without providing in some reasonable manner for the sprinkling of the streets through which their cars run."

That ordinance. contained a penal clause which is as follows, viz. :

" That any person, firm or corporation violating this ordinance shall be guilty of a misdemeanor and shall be subject to a fine of twenty-five dollars, or thirty days in the parish jail, or both, at the discretion of the Recorder," etc.

Ordinance No. 13,835, C. S., is an attempted reformation of Ordinance No. 12,911, C. S., so as to meet the interpretation which this court had placed upon it in the case cited. The difference between the two is radical in several respects :

1. The later ordinance does not provide, as the prior ordinance did, that it shall be *unlawful* for any company or corporation to operate an electric car on a street of the city without providing for " *the sprinkling of the streets* through which their cars run."

2. The later ordinance does not provide, as the prior ordinance did, that any firm or corporation violating its provisions should " be guilty of a misdemeanor."

3. The later ordinance simply requires that each and every corporation " shall water their *tracks* so as to keep the dust on same laid."

After paraphrasing the prior ordinance, our opinion speaks of its operation in this wise, viz. :

" The facts as developed by the testimony * * * are, that by reason of the velocity of the car and its weight and its rapidly revolving wheels, volumes of dust are raised and wafted by the winds to the streets adjacent to the tracks; that the clouds of dust are counter to the health and comfort of the inhabitants."

From the large number of defences and pleas which the defendant had urged in that case, as it has in this, our opinion selected that of *unreasonableness* and *indefiniteness*, resting the conclusions of the

court mainly upon the authority of Yick Wo vs. Hopkins, 118 U. S. 371.

Our opinion then says:

" There is indefiniteness in the ordinance. It does not set forth with the least particularity what shall be done, or the extent of the service required in order to escape the penalty it ordained should be inflicted for not sprinkling the streets. The failure or performance may vary each day, and in each locality where sprinkling may be requ'red. No attempt was made to indicate how the work shall be done; the days the streets should be sprinkled; the capacity for sprinkling the sprinklers should have, and the number of sprinklings that should be applied each day, or at such time as may have been intended.

" Without a matured plan covered by the terms of an ordinance in regard to sprinkling streets nothing good or useful can be accomplished. It will give rise only to confusion and failure.

"Authority must issue its orders with such clearness and definiteness that it may be understood, and the work required should be so specified that performance can be required in every locality and from every one under some defined rule.

"There should be some similarity in the work in each district; there can not be under this ordinance. There should be a measure of duty imposed, and those upon whom it is imposed should not be left to conjecture how much or how little they should do."

The opinion then deals with the question of the equality and uniformity of the operation of the ordinance and it thus proceeds:

" This brings us to the objection that the ordinance is not equal and uniform in its operations, and imposes an unjust and oppressive burden upon a particular class of persons or corporations.

" In so far as relates to the work of 'sprinkling' the streets from curb to curb less that portion over which defendant has a franchise, in our judgment, the requirement of the ordinance is not equal and uniform.

" *Those streets are used by the public.* The work necessary to maintain their cleanliness, or to insure freedom from excessive dust, is a burden which the municipality can not impose upon particular persons and corporations, *only because they own a franchise over an adjacent way.* * * * The defendant can not be compelled to clear and sprinkle streets not covered by its contract and

over which it has no franchise. The dust raised by defendant's cars, it may be, is carried by winds to the streets near. The evidence does not disclose that such is a fact. Presumbably however it is; but defendant's cars are not the only vehicles which raise the dust, and it would scarcely be desirable equality to make it sprinkle all the dust."    (Our italics.)

As well illustrating the scope of that ordinance, the following extract from our opinion may be cited, viz. :

" The question may be propounded:  Can they not be made to sprinkle their own tracks and relieve their own road, as well as the adjacent streets, or the dust raised by their cars?

" To this the answer immediately suggests itself:  The ordinance being indefinite and uncertain, it would serve no purpose to decide in this case the issue raised by the question,"

The conclusion reached was, that the ordinance was both indefinite and unreasonable, and consequently illegal, and that the penalty it provided could not be enforced.

This extended quotation from our opinion was considered necessary for the purposes of showing (1) that the ordinance was considered indefinite and unreasonable, principally upon the ground that it should be unlawful for a corporation " to operate any electric, trolley or other cars or trains on the streets of the city without first providing; in some reasonable manner, for the *sprinkling of the streets* through which *their cars run* " —that is to say, from curb to curb.

That provision required of street car companies to provide " in some reasonable manner for the sprinkling of the streets through which their cars run," notwithstanding they were at the same time used and employed for the general uses and traffic of the city.

Simply because they exercised a franchise upon certain streets of the city, the ordinance singled out these corporations, and imposed upon them, solely and alone, to bear a public burden which should have been discharged by the city, or shared by the general public.

Besides that, the terms of the ordinance which required of street car companies that they should provide " in some reasonable manner for the *sprinkling* of the streets " were most indefinite and indefinable, as to time, manner, amount and extent.

The ordinance under present consideration is free of many of those complications; and it was doubtless the intention of the City Council that it should be entirely disembarrassed by them.

Recurring to its phraseology we find " that each and every com-
pany or corporation operating street car lines within the limits of
the city of New Orleans *shall water their tracks*," but not only so,
but to water them " so as to effectually *keep the dust on same laid.*"

It is obvious that the duty imposed is specific; that is, "to water
their tracks." It does not require them to "*sprinkle* the streets,"
nor to sprinkle their tracks, but to *water* them. Water them where,
and to what extent? " So as to effectually keep the *dust laid on
same.*"

To water that part of the streets which is occupied and used by
their tracks, and immediately covered by their franchises, is an
altogether different thing from sprinkling the streets from curb to
curb; and, to a very great extent at least, relieves the ordinance of
the onerous and oppressive feature that was properly attributed to
the former ordinance—the imposition upon private individuals and
corporations of a public burden.

We are thus brought to the discussion of the sole remaining ques-
tion in this case, and that is whether or not this ordinance evidences
and authorizes a proper and legitimate exercise of the police power;
for it must be admitted—and it is a question which is free from doubt
—that if it trenches, in any particular, upon the defendant's contract
rights, it is inimical to the contract clause of the Federal Constitution.

Among the powers which are expressly conferred upon the City
Council are the following, viz.:

" That the Council shall have power, and it shall be their duty to
pass such ordinances, and see to their faithful execution, as may be
necessary and proper; * * * to regulate * * * all places of
business likely to be or become detrimental to health; and to adopt
such ordinances and regulations as shall be necessary or expedient
for the protection of health and to prevent the spread of disease;
and to maintain a good sanitary condition in the streets, public places
and buildings," etc. Section 14 " C," Act 45 of 1896, the city charter.

It specially provides that it is the duty of the City Council to pre-
serve the good order of the city and " to maintain its cleanliness and
health." *Id.*

They are specially required " to suppress all nuisances." *Id.*

That " the Council shall have the power to authorize the use of
the streets for railroads operated by horse, electric, steam, or
other motive power, and to *regulate* the same," etc. *Ibid.*, Sec. 15,
paragraph 13.

The evident purpose and object of these and other provisions of the city charter was, in express terms, to subordinate the uses and franchises the city should have granted to street railroad companies to its right to *regulate* the same and keep them subject to its police dominion and control; for it can not be reasonably contended that because a corporation or private person has acquired the franchise of operating lines of electric cars in the streets of the city, that such franchise carries with it the right to so use and operate their cars as to become detrimental to the public health of the city, and hence a public nuisance, and that the City Council has not the power to regulate the same by means of reasonable and appropriate ordinances.

It is the right of *use* and not of *abuse* that the franchise confers.

It is evident that the city can not barter away her police powers; nor can she, by her contracts, estop herself from exercising the power of suppressing nuisances, or preserving the public health, and the comfort and cleanliness of the inhabitants of the city.

It is equally evident that an ordinance which requires that a public business should be so conducted, or a public franchise so operated, as not to be detrimental to the public health, or the cleanliness and comfort of the people of a city, does not deprive the owner of such a franchise of its property without due process of law or adequate compensation.

That in the latitude in which the city of New Orleans is located, and in its physical situation, of which this court will take judicial cognizance, the operation of electric cars during a protracted summer season, where thousands of persons—particularly ladies and children—are constantly traveling in them, will produce a sufficient quantity of dust, in their operation, to constitute a nuisance to passengers, and become detrimental to public health, needs no demonstration.

Of course it is idle for the council to attempt to coerce those corporations to so operate their cars as to create no dust. That would be a physical impossibility.

Hence the City Council has attempted. to do the only thing which, in our opinion, it was possible for them to have done—that is, to pass an ordinance requiring them "to water their tracks so as to effectually keep the dust laid on same."

Following the rule which we have constantly adhered to in this

class of cases, we have looked into the evidence for the purpose of ascertaining whether the *dust* is produced by the defendant's cars, or sensibly contributed thereto by them upon their tracks; for upon such evidence must depend the right of the City Council to attempt to regulate the defendant's *use* of its franchise so as to preserve the health, comfort and cleanliness of the people using its cars.

In the first place the record contains an agreement to the effect "that all the testimony and evidence offered on the part of the New Orleans City & Lake Railroad Company and the city of New Orleans in the original suit, No. 15,559"—the case from which we have made extracts *supra*—be considered and received as offered "in the instant case without being copied into this transcript," etc.

The testimony of one of the defendant's witnesses in this case, as shown by the following interrogation, fairly illustrates the situation:

"Q. How is the dust brought upon the car track?

"A. The dust is brought, or rather the wind is brought on the car tracks by vehicles coming from unpaved streets principally. There are also large quantities of manure, etc., dropped on the streets.

"Q. None of which is dropped by the electric cars?

"A. No, sir.

"Q. After a rain, and the streets become muddy, and the vehicles, as you say, by the mud being attached to their wheels, carry it and deposit it on the tracks? What becomes of it?

"A. The mud is dried first, of course, and the vehicles grind that mud into dust.

"Q. The vehicles grind the mud into dust?

"A. Yes, sir; other vehicles.

"Q. Vehicles alone?

"A. Vehicles and animals.

"Q. In what respect do the cars contribute toward grinding this mud into dust?

"A. To a very small extent—only on the surface of the rails.

"Q. Is that appreciable?

"A. Well, it is only a matter of opinion. I don't think it does amount to anything.

"Q. After this mud is dry and becomes ground into dust by vehicles, and by the tramping of horses and mules, what becomes of it?

"A. Well, it stays on the street; *to a very large extent the cars have a tendency to brush it off the tracks.*"  (Our italics.)

The witness thus describes the situation after the cars have been operated on the streets for several days, and the drying process of fair weather has had its effect upon the mud which has been thus brought upon the railroad tracks.

" Well, on a paved street there is a section between the rails— between the rails and the gutter which is comparatively clean; *the dirtiest portion of the street is nearest the rails inside and out; principally out, where the dirt is dropped from the wheels of the vehicles.*"

Again:

" Q. With the exception of the few narrow streets to which you have referred I understand you to say *that the effect of a car passing over the roadbed after the mud has been ground and dried is to sweep by its passage the dust away from the car track?*

"A. The effect is to clean the track."

Obviously, the trend of this statement and of other witnesses to the same effect is to establish the fact that the ears of the street electric railway companies are an important factor in raising the dust which is complained of as a nuisance and a discomfort. This proof is consonant with common knowledge and experience on the subject.

That the movements of the electric cars produce a great deal of dust is substantiated by the witnesses who testified in suit 12,559, to which we have referred.

The following interrogation of a witness in that case will illustrate that proposition, viz.:

" Q. Have you ever seen a street car run through the Third District?

"A. I think I have.

" Q. Well, I have you, I say?

"A. Yes, sir, I have certainly.

" Q. What line?

" A. Dauphine line—Dauphine and Barracks.

" Q. What effect did the passage of these cars have upon the dust of the streets?

" A. It has a great deal of effect.

" Q. Please state what the effect is?

" A. It creates a great deal of dust.

" Q. Is that dust uncomfortable?

" A. Very much, sir.

" Q. Do they create any more than any other vehicles passing the street?

" A. Yes, sir."

He says " there is a greater quantity of dust where the cars are running, and you can follow up behind every car in my street and see rafters of dust after every car."

Another witness says that through the streets that are ordinarily traversed by these cars " more dust is raised by them than by any other vehicle that I have seen traveling on the streets."

This witness was a practising physician in the city of New Orleans of thirteen years' experience.

" Q. What is the effect of these clouds of dust on the health of the inhabitants of those streets and the passengers in the cars?

" A. (Substantially that) ' inhaling of dust raised by those cars is irritating to the organs of respiration,' " etc.

This witness confirms the statement of the former witness with regard to the greater volume of dust which is produced by the electric cars than any other vehicles which use the streets of the city.

The following is quoted from the interrogation of the president of the State Board of Health, viz. :

" Q. Your Board of Health has requested the authorities to enforce this ordinance which the accused is charged with violating?

" A. No, sir; we attempted to enforce it ourselves, believing that we were capable of enforcing all ordinances connected with sanitation.

" Q. Now, you have noticed these cars going through the streets—these electric cars?

" A. Yes, sir.

" Q. Do they create any dust—more than any other vehicle?

" A. I think they are the cause of the dust arising.

" Q. Now, in the operation of those cars without sprinkling the streets, does that constitute a nuisance?

" A. I think it has an injurious effect upon the health.

" Q. Has the Board of Health ever declared this operation of the cars, without sprinkling the streets, a nuisance.

" A. I could not say that the specific action of the board stated that it was a nuisance, but the board did, by specific action, determine to enforce the law as a sanitary measure.

" Q. Now, when you say as a sanitary measure, is the operation of

the cars, without sprinkling, injurious to the health of the inhabitants?

" A. Well, the dust we conceive to be injurious.

" Q. It is?

" A. Yes, sir.

" Q. And is it more injurious, or is more injury caused by the dust from the street cars, than from the dust from any other vehicle?

" A. By reason of the greater amount of dust."

Again:

" Q. Doctor, you have ridden around the city in street cars during dusty weather?

" A. Yes, sir.

" Q. Have you ever been inconvenienced by the dust in those cars?

"A. Yes, sir; frequently."

Another witness, a member of the Board of Health, and a physician of thirty years' experience, said:

"Q. You have often traveled in street cars oi New Orleans City & Lake Railroad Company?

"A. Yes, sir; very often all over the city?.

" Q. Do they create any dust?

"A. Yes, sir; they do.

"Q. Do they create any more dust than any other vehicle passing through those streets?

" A. I think so; by reason of the velocity of the car which gives a kind of draught or vacuum which causes large volumes of dust to surround the car."

So much of the evidence is sufficient for all the necessary purposes of this case; and whether same be put to the practical test of the judgment of the layman and casual observer, or that of scientific analysis and sanitation, we think it reasonably clear that the operation of the street electric cars is the principal cause of the dust which is complained of, and that it is shown to be a nuisance, injurious to the public health and that of persons who use them for purposes of travel, and detrimental to the comfort and convenience of the public.

We regard the foregoing evidence as a complete answer to the following proposition which we have extracted from the brief of defendant's counsel, viz.:

76

"The defendant further shows that the need to keep the dust laid on the lines of track, if any such need there be, was a necessity that arose in the course of nature and is not a state or condition brought about by the operation of the said street car lines; and that it is unlawful and unreasonable to impose upon corporations operating said lines, the duty to keep the dust laid when the said duty has no relation to the operation of the said street car lines, and arises from no condition created or brought about by the operation of said lines; and when said service is not required by the contract with the city and the duty of service is outside and beyond the contract, and a duty which is owed by the municipal authorities to the inhabitants."

Again:

"The Canal & Claiborne Railroad Company, the licensee of the city of New Orleans, has purchased and paid for the right to use certain streets for the carrying of passengers. It pays a license tax, as well as property tax, and is performing a *quasi*-public function, carrying passengers for hire in the streets. The fact that it is *quasi*-public, and has purchased and paid for this right to use the streets, does not destroy the character of its business, or make it subject to other and different rules of law than any other citizen who uses the street for profit. It would be unreasonable to require the dray owner to attach a sprinkling apparatus to his dray, or to require his dray to be followed by a water cart; and it would be unreasonable to require the omnibus lines to run sprinkling carts; it would be unreasonable to require of the procession of furniture vans, sugar wagons, cotton floats and pleasure vehicles to be equipped with sprinkling apparatus, or to be preceded or followed by water carts, simply because they use the streets of the city. And so we say that there is no reason to require the street car companies to perform this service at great expense when the service is not required of other persons or firms, or corporations making a like use of such public highways. And when it is seen that the dust is not produced by the railway company, is not brought upon the street by them, but its appearance and the annoyance of the dust is not related to the operation of the railroad lines, to require them 'to lay' the dust would be no more reasonable than to require them to remove the garbage, sweep the streets, clean the gutters and light or pave the streets, or maintain the police along their route."

The examples counsel gives of the right which the proprietor of a

dray, the water-cart, the omnibus, furniture van, sugar wagon, cotton float and pleasure vehicle has to the free use of the street for the purposes of his business are inappropriate, because neither exercises a franchise on the public streets of the city; but their use of the streets is just the ssme as that of any other private citizen.

Whilst each of said proprietors are licensed by the city to pursue his respective calling, his use of the streets is merely incidental thereto; but the street-car company purchases from the city a public franchise or right to lay its tracks of steel fixedly and permanently in the centre of the public highways of the city, and to maintain same therein for a period of years, and to operate their cars thereon for the purpose of carrying passengers for hire.

And it is disclosed by the evidence thst the dust which occasions the inconvenience and discomfort of the passengers, and the detriment to public health, is directly and immediately referable to its use of that franchise, and it is that injurious use and enjoyment of its franchise which the aforesaid ordinance is intended to regulate.

The question arises upon the foregoing state of facts, whether the watering of the tracks of the street railroad companies so as to effectually keep down the dust, as proposed in the ordinance, is an exercise of the police power; if so, is it reasonable, definite, and equal and just in its operation.

The ordinance is merely a municipal regulation, and in no sense a criminal statute. Corporation of Amite City vs. Holly, 50 An. —.

The persons with whom it exclusively deals are public corporations who are operating public franchises to be operated as carriers of passengers for hire, and the evident object of the City Council in enacting it was to improve the comfort and convenience of the passengers who were transported upon it and incidentally to suppress a *quasi*-nuisance and preserve the public health.

It is further argued by defendant's counsel that the large expense of watering their tracks will render this ordinance so burdensome as to seriously impair its franchise and render its revenues non-remunerative.

To this proposition there are two sufficient answers: (1) that this exigency of defendant's franchise must be reasonably supposed to have been within the contemplation of the contracting parties when the franchise was secured, and consequently an incident thereof; (2) that the greatly increased convenience and comfort of travel

which the suppression of the dust would occasion would entirely compensate the increased cost by a corresponding increase of travel.

The principles of law appertaining to the exercise of the police power of a State or municipal government have been so frequently enunciated by the courts of this State as well as by those of other States, and of the Supreme Court, that the chief difficulty presented to the judicial mind consists in the selection to be made therefrom of those most suitable to the question under discussion.

It wil therefore be useful to jurisprudence to quote from some of the most conspicuous decisions and apply their precepts to the instant case.

In Chaffe & Sons vs. Trezevant, 38 An. 746, this court said:

" What the police power of a State is, it is difficult to determine with precision. It is generally said to extend to the protection of the lives, health and property of the citizens and the preservation of good order and good morals; to the promotion of domestic tranquillity and the comfort and quiet of all persons.

"By the general police power of a State, persons and property are subject to all kinds of burdens and restraints in order to secure the general comfort, health and prosperity of the people."

In Bass vs. State, 34 An. 494, it was well said that " it is a settled principle, growing out of well ordered society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his *use* of it shall not be *injurious* to the equal enjoyment of others having an equal right to the enjoyment of their own property, nor injurious to the rights of the community."

That opinion was very largely predicated upon the leading case of Commonwealth vs. Alger, 7 Cushing, 53, which is cited in the brief of defendant's counsel.

In the conspicuous case of Stone vs. Mississippi, 101 U. S. 814, the Supreme Court said:

" All agree that the Legislature can not bargain away the police power of a State.

 *    *    *    *    *    *    *

" Many attempts have been made in this court to define the police power, but never with entire success.

" It is always easier to determine whether a particular case comes

within the general scope of the power, than to give an abstract definition of the power itself which will be in all respects accurate.

"No one denies, however, that it extends to all matters affecting the public health or the public morals." (See also Beer Company vs. Massachusetts, 97 U. S. 25; Patterson vs. Kentucky, 97 U. S. 501; Boyd vs. Alabama. 94 U. S. 645; Fertilizing Co. vs. Hyde Park, 97 U. S. 659; Munn vs. Illinois, 94 U. S. 124; Metropolitan Board, etc., vs. Barrie, 34 N. Y. 657.

The court then added this strong statement, viz. :

" No Legislature can bargain away the public health or the public morals. The people themselves can not do it, much less their servants. The supervision of both these subjects of governmental power is continuing in its nature, and they are to be dealt with as the special exigencies of the moment may require. Government is organized with a view to their preservation, and can not divest itself of the power to provide for them.

" For this purpose the largest legislative discretion is allowed and the discretion can not be parted with any more than the power itself."

In Trustees of Dartmouth College vs. Woodward, 4 Wharton, 518, Chief Justice Marshall employed this forcible language, viz. :

" The people in their sovereign capacity have established their agencies for the preservation of the public health and the public morals, and the protection of public and private rights. These several agencies can govern according to their discretion, if within the scope of their general authority while in power; but they can not give away nor sell the discretion of those that are to come after them, in respect to matters, the government of which from the very nature of things must vary with varying circumstances.

" They may create corporations and give them, so to speak, a limited citizenship; but as citizens, limited in their privileges or otherwise, *these creatures of the government creation are subject to such rules and regulations as may from time to time be ordained and established for the preservation of health and morality.*

" *The contracts which the Constitution protects are those that relate to property rights, not governmental.*" (Our italics.)

The foregoing authorities, particularly the last, seem especially appropriate to this case.

In making an application of these principles, one of the text writers

says that the correct doctrine is "that while the State may not prohibit a business, innocent in itself, when it is pursued in a lawful way not injurious to the community; and while the police regulation of pursuits, and of the employment and uses of property must be limited to such restrictions as are reasonably necessary to protect legitimate public interests, and to secure, as far as possible, the largest freedom and the greatest good of all members of the community, it is not within the authority of judicial tribunals, to set aside laws enacted ostensibly to promote the public welfare, unless it is *perfectly clear upon the face of the statutes*, or from their terms, that they have no real or substantial relation to the objects to which they purport to be directed, or that they infringe upon and impair fundamental rights secured by constitutional guarantees."

Parker and Worthington's Public Health and Safety, Sec. 9; Tiedeman's Police Power, Sec. 2; Cooley's Con. Limitations, pp. 177, 201; Davis vs. State, 68 Ala. 58; State vs. Wheeler, 25 Conn. 290; Boston vs. Cummings, 16 Ga. 102; State vs. Clatter, 33 Ind. 409; Humes vs. Railroad Co., 82 Mo. 221; Berthoff vs. O'Reilly, 74 N. Y. 509;

"In other words," says the writer, "the right to exercise the police power can not be alienated, surrendered or abridged by a State Legislature by any act, grant, charter, contract or delegation whatsoever, because, it is said, it is a governmental function without which the Legislature would be powerless to protect those rights which it was especially designed to secure. So that the Legislature can not, even by charter granted to a corporation, confer any *irrepealable right to continue the exercise of franchises in a way that may have become injurious to the public*," citing Stone vs. Mississippi, *supra, ibid.*

In treating of the police control of corporations, Mr. Tiedeman says:

"It has been supposed that because it is the settled law of this country that the Legislature of a State can not repeal or amend the charter of a private corporation unless the power is expressly reserved, these perpetual corporations are placed beyond the reach of the ordinary police power of the State; that while the rights of the natural person are subject to the exercise of the police power in the interest of the public, those corporations are free from this burden because the slightest police regulation operates as a *restric-*

*tion of the enjoyment of the corporate franchise, and hence impairs the obligation of the contract.*

"Such a construction of the operation of this constitutional pro-vision is not only scientifically absurd, but it is in violation of the ordinary rules of constitutional construction, which provide for a strict construction of all grants by the State to the individual.

"Apart from the question whether the State can barter away its police power, the intention of the Legislature to place a private corporation beyond the reach of the police power of the State; to grant to a corporation the right to do what it pleases in the exercise of its corporate powers, it matters not how much injury is inflicted upon the public, and yet be subject to no control or restraint which is not provided by the laws in force when the charter was granted, is so manifestly unreasonable that we can not suppose that the Legislature so intended, unless this extraordinary privilege is expressly granted.   *   *   *

"The subjection of *existing corporations to new regulations does not involve a repeal or amendment of the charters, for an act of incorpora-tion simply guarantees the right* to act and do business as a corporate body, *subject, of course, to the laws of the land, and the legitimate con-trol of the government*" (our italics). Tiedeman's Lim. of Police Power, Sec. 189, 1890.

These two sections of that excellent treatise are largely drawn from the conspicuous Louisiana case, Butchers' Union Slaughter-house Company vs. Crescent City Live Stock Company, 111 U. S. 746.

In that case the court broadly and emphatically said, that the Legislature of a State "can not, by any contract, limit the exercise of its police powers to the prejudice of the general welfare. These are the public health and the public morals. The preservation of these is so necessary to the best interests of the social organization that a wise policy forbids the legislative body to divest itself of the power to enact laws for the preservation of the health and the repression of crime."

The author again says:

"But the corporation is no more subject to arbitrary regulations than is the individual. In order that the regulation of a corporation may be within the constitutional limitations of police power it must have reference to the welfare of society by the prevention or con-trol of those actions which are calculated to inflict injury upon the

public or the individual. As in all other cases of the exercise of the police power, the police regulations of corporations must be confined to the enforcement of the maxim *sic utere tuo ut alienum non lædas*, subject to the observance of which every corporate charter must be supposed to have been granted." Section 191, *Id.*

The foregoing principles were sanctioned by this court in State vs. Heidenhain, 42 An. 483, in which it was said by the court:

" The police power delegated to the city of New Orleans in its charter, gives ample authority to the city to maintain its cleanliness and health, and to maintain good sanitary conditions in the streets, public places and buildings, to suppress all nuisances and to impose a fine and imprisonment for the violation of such ordinances," etc.

Again:

" The authority to abate nuisances is a part of the police power vested in all large and populous cities. To determine what is a nuisance is a question of fact."

In that case this court maintained as a valid and reasonable exercise of the police power of the city of New Orleans, an ordinance prohibiting smoking in the street cars of the city.

In State vs. Lochte, 45 An. 1405, this court maintained the legality of an ordinance of the city of New Orleans which prohibited private individuals from obstructing the streets and banquettes of the city, as an exercise of the police power of the city.

But in addition to the foregoing authorities on the general principles of law applicable to this kind of a case, we have been referred to a case in point, The City & Suburban Railway Co. of Savannah vs. The Mayor, etc., 77 Georgia, 732; and from the statement in the opinion it appears that the appellant was fined by a city police court on the charge of " neglecting to water the track on which it ran through the streets of the city."

The court said:

" Surely to keep down the dust from the railways' own tracks by watering them within the city limits and on its streets is a very requisite and necessary thing for the welfare and convenience of the inhabitants on the streets over which the road is constructed, to say nothing of its health-preserving effect. The cars constantly run; almost every minute they pass each house on the street, and if the track be left unwatered the dust becomes very inconvenient to those who lodge in the house, and in warm weather sit on the stoops or open the windows."

The court sustained the ordinance as legal and rested their conclusions mainly upon Railroad Company vs. Richmond, 96 U. S. 521, in which the court held that "the appropriate regulation of the *use* of property is not 'taking' it within the meaning of the constitutional prohibition."

Judge Dillon, in a recent edition of his work, approves the decision of the Georgia court and says:

"Under its police powers and authority over streets a city may require street railway companies *to keep their streets watered* so as to be free from dust." 2 Dillon's Munic. Corps., Sec. 720 (Fourth Edition).

McDonald vs. Toledo Consolidated Street Railway Co., 74 Federal Reporter, 104, announce a similar doctrine.

A similar ordinance was sustained by the Pennsylvania Court recently in Chester vs. Chester Traction Company; American Digest, 1897, p. 4928.

On reason and authority we are of opinion the ordinance of the City Council of the city of New Orleans must be sustained as a legal exercise of the police power, and as neither indefinite nor unreasonable.

Judgement affirmed.