(93 South. 308)

## STATE v. GOLDSTEIN. (6 Div. 926.)

(Court of Appeals of Alabama. June 13, 1922.)

1. Sales ⟨key⟩48¾, New, vol. 16A Key-No. Series — "Fraudulent" imports deception or overreaching, and has no significance when dissociated therefrom.

The word "fraudulent" in its legal sense is used to stigmatize an act or transaction by which the actor deceives or overreaches another wrongfully and to his hurt, and when dissociated from any deception in the act of selling, as in Acts 1919, p. 1088, relative to profiteering, is merely an opprobrious epithet, without legal or logical significance, as applied to the price asked by the seller (citing Words and Phrases, Fraudulent). (Response of Supreme Court to certified questions.)

2. Sales ⟨key⟩48¾, New, vol. 16A Key-No. Series—Purpose of statute against profiteering stated.

The purpose of Acts 1919, p. 1088, penalizing profiteering, is to punish with a heavy penalty any dealer or any person who sells or offers any article or commodity of the classes named, at a price which in the estimation of a jury would yield a grossly excessive profit to the seller. (Response of Supreme Court to certified questions.)

3. Sales ⟨key⟩48¾, New, vol. 16A Key-No. Series—"Necessity of life" held without certain meaning.

The term "necessity of life," when used without other definition, as in Acts 1919, p. 1088, relative to profiteering, is without any certainty or meaning, but varies according to the financial or social status of the individual, as well as according to time and place (citing Words and Phrases, "Necessity" and "Necessary"). (Response of Supreme Court to certified questions.)

4. Sales ⟨key⟩48¾, New, vol. 16A Key-No. Series—That power to regulate prices never exercised persuasive evidence that it never existed.

That during the century of the state's political existence no Legislature has ever attempted to exercise the power of regulating the selling price of useful and harmless commodities, so long as trade is free and unaffected by monopolistic combinations, artificial restraints or emergency conditions involving temporarily the health or safety of the public, is a persua-

sive argument that the power has never existed. (Response of Supreme Court to certified questions.)

**5. Constitutional law ⬧258—Sales ⬧48¾ New, vol. 16A Key-No. Series—Statute penalizing "profiteering" held an abuse of the police power and void.**

Acts 1919, p. 1088, punishing profiteering defined in section 2 as the selling or offering of any article of food, clothing, fuel, or other necessity of life with the intent to obtain a fraudulent or greatly excessive price over its true or intrinsic worth, is a clear abuse of the police power, and violates the declarations and guaranties of Const. Ala. 1901, Bill of Rights, and Const. U. S. Amend. 14, and is to that extent void. (Response of Supreme Court to certified questions.)

**6. Courts ⬧90(2)—Views of individual judges immaterial, unless adopted by majority.**

The views of individual judges are of no concern, unless they are adopted at least by a majority of the court.

McClellan and Thomas, JJ., dissenting as to the response.

Appeal from Circuit Court, Jefferson County; H. P. Heflin, Judge.

Criminal prosecution by the State against D. B. Goldstein. From a judgment sustaining demurrers to the complaint filed by the solicitor, charging defendant with profiteering, and in effect holding the act void, the State appeals. Affirmed.

Harwell G. Davis, Atty. Gen., for the State.

Brief of counsel did not reach the Reporter.

Beddow & Oberdorfer, of Birmingham, for appellee.

Brief of counsel did not reach the Reporter.

BRICKEN, P. J. This prosecution originated in the municipal court of Birmingham, wherein appellee was charged by affidavit with the offense of violating the terms of the statute approved September 30, 1919 (Acts 1919, p. 1088), known as the antiprofiteering act. From a judgment of conviction in said municipal court, the defendant appealed to the circuit court, and was there put to trial upon a complaint filed by the solicitor. In the circuit court demurrers were interposed to the complaint. The demurrers raised the question of the constitutionality of the act upon which the prosecution was predicated, and the judgment entry shows that the demurrers to this point were sustained, and as a result the court below held the statute in question to be unconstitutional. From a judgment to this effect the state appealed to this court. On submission here this court entertained the opinion that the court's ruling in this respect was without error. But this court, not having the authority to so declare, certified the question to the Supreme Court as follows:

**Certified Questions from the Court of Appeals.**

Appellee was charged by complaint in the municipal court of Birmingham with a violation of the terms of the statute, entitled:

An act "to define trusts, monopolies, combines, profiteering and unlawful acts in hoarding, cornering or storing commodities with the purpose and intent to probably influence the price of food, commodities or any necessities of life and to fix civil and criminal liabilities. penalties or punishment and to provide remedies for the enforcement in such cases." Approved September 30, 1919, Acts 1919, p. 1088.

From a judgment of conviction in said court an appeal was taken to the circuit court, and upon the trial of the case in said court the act, supra, was declared unconstitutional, and from this ruling the solicitor, in behalf of the state, takes this appeal.

For the information of the Supreme Court, the complaint, demurrers, and judgment in the circuit court are set out as follows:

**Solicitor's Complaint.**

The State of Alabama, Jefferson County.

The Circuit Court of Tenth Judicial Circuit.

On Appeal from Jefferson County Court of Misdemeanors.

The state of Alabama by its solicitor complains of ——: That within 12 months before the commencement of this prosecution, D. B. Goldstein did sell or offer for sale an article of commodity of clothing, to wit, a pair of ladies' hose, at and for the sum of $1.79, a necessity of life, with the intent of obtaining fraudulent or grossly excessive price over its true or intrinsic worth.

(2) And further that within 12 months before the commencement of this prosecution in said county, D. B. Goldstein did sell or offer for sale a pair of ladies' hose for $1.79, a commodity or article of clothing, a necessity of life, with the intent of obtaining a fraudulent or grossly excessive price over its true or intrinsic worth, against the peace and dignity of the state of Alabama.

Jos. R. Tate, Solicitor.

**Demurrer to Information.**

Comes the defendant, D. B. Goldstein, and demurs to the complaint or information and each count thereof separately, and for grounds of demurrer sets down and assigns the following:

(1) Because said complaint or information states no offense.

(2) Because it does not appear whether the intent was to obtain a fraudulent or a grossly excessive price.

(3) Because it does not appear, except as a conclusion of the pleader, that there was an intent to obtain a fraudulent or grossly excessive price.

(4) Because it does not appear at what price said article was sold, or intended to be sold, nor what would have been a fair or reasonable or lawful price to sell the same.

(5) Because it does not appear what was the true or intrinsic worth of the article.

(6) Because the act, entitled "An act to define trust, monopolies," etc. (Acts 1919, p. 1088), or so much thereof as is relied upon in this case, and upon which the complaint or information is drawn, is contrary to the Constitution of the United States.

(7) Because the act under which this complaint or information is drawn (Acts 1919, p. 1088), or so much thereof as is the basis of this complaint or information, is in violation of the Constitution of Alabama.

(8) Because the act under which this complaint or information is drawn (Acts 1919, p. 1088), or so much thereof as is the basis of the complaint or information, is in violation of section 6 of the Constitution of Alabama, and is null and void.

(8) Because the act under which this complaint or information is drawn (Acts 1919, p. 1088), or so much thereof as is the basis of the complaint or information, is in violation of section 7 of the Constitution of Alabama, and void.

(9) Because the act under which the complaint or information is drawn (Acts 1919, p. 1088), or so much thereof as is the basis of the complaint or information, is in violation of section 22 of the Constitution of Alabama, and void.

(10) Because the act under which this complaint or information is drawn (Acts 1919, p. 1088), or so much thereof as is the basis of the complaint or information, is in violation of section 1 of the Fourteenth Amendment to the Constitution of the United States, and is void.

(11) Because the act under which this complaint or information is drawn (Acts 1919, p. 1088), or so much thereof as is the basis of the complaint, is in violation of article 7, section 10, of the Constitution of the United States, and void.

(12) Because it does not appear that the defendant was or remained a party to any profiteering, except as a bare conclusion of the pleader, and no sufficient facts are alleged to warrant the conclusion.

(13) Because the law upon which the complaint or information is based does not define the offense of profiteering, but leave the nature of said offense to the whim of a judge or jury, and is in violation of the Constitution of Alabama or the Constitution of the United States, either or both.

(14) Because the statute entitled "An act to define trust," etc., approved September 30, 1919 (Acts 1919, p. 1088), is in violation of the provision of the Constitution of Alabama (section 6), which provides that "the accused shall have the right to demand the nature and cause of the accusation," and the provision that the accused "shall not be deprived of life, liberty or property except by due process of law," and

in violation of section 7 of the Constitution of Alabama, wherein it is provided, "and no person shall be punished but by virtue of a law etablished and promulgated prior to the offense and legally applied."

Beddow & Oberdorfer, Def'ts. Attys.

Filed in court this 7th day of March, 1921.

### Judgment Entry.

The State v. D. B. Goldstein.

### Affidavit for Profiteering.

Appealed from Jefferson County Court of Misdemeanors. Honorable H. P. Heflin, presiding.

This, the 7th day of March, 1921, came Joseph R. Tate, solicitor, who prosecutes for the state of Alabama, and also came the defendant in his own proper person and by attorney, and the defendant demurs to the solicitor's complaint in this cause this day filed, which said demurrer coming on to be heard and determined by the court, after due consideration thereof by the court, it is ordered by the court, and it is the judgment of the court, that said demurrer be, and the same is hereby, sustained by the court on account of the unconstitutionality of the statute under which the defendant is being prosecuted; and it is ordered by the court that said defendant be, and he is therefore, discharged.

Notice of Appeal being given by the state, and it appearing to the court that certain questions of law were reserved by the state of Alabama for the consideration of the Court of Appeals of Alabama, it is ordered by the court that the execution of the judgment in this cause be, and the same is hereby, suspended until the decision of this cause by said Court of Appeals of Alabama.

### Certified Questions to Supreme Court.

Under the provisions of the statute in such cases made and provided, the following questions are hereby submitted to the Supreme Court for determination:

1. Is the act, entitled "An act to define trusts, monopolies, combines, profiteering and unlawful acts in hoarding, cornering or storing commodities with the purpose and intent to probably influence the price of food, commodities or any necessities of life and to fix civil and criminal liabilities, penalties or punishment and to provide remedies for the enforcement in such cases," approved September 30, 1919 (Acts 1919, p. 1088), violative of section 6 of the Constitution of Alabama?

2. Is the act supra, violative of section 7 of the Constitution of Alabama?

3. Is the act supra violative of section 22 of the Constitution of Alabama?

4. Is the act supra violative of the Constitution of Alabama, or of section 1 of the Fourteenth Amendment of the Constitution of United States?

The above questions are submitted to the Supreme Court as abstract propositions, as directed by the statute, reference being made

to the case in which the questions arise, for the convenience and information of the Supreme Court.

C. R. BRICKEN, Presiding Judge.
WM. H. SAMFORD,
H. P. MERRITT, Judges.

In response to same the Supreme Court rendered the following opinion:

The State of Alabama v. D. B. Goldstein.

Appeal from Jefferson Circuit Court to Court of Appeals.

Question Certified by Court of Appeals to Supreme Court under Acts 1911, p. 449.

SOMERVILLE, J. It will be observed that the act makes "profiteering" a crime, the penalty for which is a maximum fine of $5,000, and imprisonment at hard labor for the county for not exceeding two years, and also subjects the "profiteer" to a civil suit, to be instituted by the Attorney General in the name of the state, wherein may be recovered such damages "as the jury see fit to assess."

Section 2 of the act defines the offense of "profiteering" as "the selling or offering for sale of *any* article or commodity of *food, clothing, fuel or other necessity of life* with the intent of obtaining *fraudulent* or *grossly excessive* price over its true or intrinsic worth."

Section 2 further provides that—"in the ascertainment of whether such price is fraudulent or grossly excessive regard may be had to the *cost price* of said article or commodity to the person selling or offering the same; or evidence may be given of the *cost price* on the market of articles, commodities or necessities of *like kind or character*."

Section 7 provides that "in all cases, the question of whether the party sued violated any provision of this act, shall be a question for the jury."

The conclusion of this court upon the constitutionality of the quoted provisions of this act will be, in the opinion of the writer, the most momentous decision it has rendered in the last half of a century.

Intended to correct an economic evil—the exaction of unreasonable profits in trade—which followed in the wake of the World War, and which prevailed in every part of America, as it did in almost every part of the civilized world, the act is nevertheless, in its essential nature and effect, a direct challenge to those theories of personal liberty and freedom of action which underlie and permeate constitutional government in America. It is, in short, a radical and epochal departure from the trodden paths of governmental action under hitherto recognized constitutional restraints, and a bold excursion into the field of purely paternalistic control of the private business of citizens.

[1] The offense which is defined and denounced is the selling or offering for sale of any article or commodity of the classes named with the intent of obtaining a *fraudulent* or grossly excessive price. The word "fraudulent," in its legal sense, is used to stigmatize an act or transaction by which the actor *deceives* or overreaches another, wrongfully and to his hurt. See 26 Corpus Juris, 1059, 1060; 3 Words and Phrases, 2955. Dissociated from and *deception in the act of selling,* the term "fraudulent," as applied to the price asked by the seller, is merely an opprobrious epithet, without any legal or logical significance. As a form of denunciation it is, of course, intelligible, but the price in question might just as aptly be denounced as *larcenous* or *murderous.* In neither case would the epithet alter the nature and quality of the thing. Nor is it apparent to our understanding how the substitution of "and" for "or," and the reading "fraudulent and grossly excessive price," as suggested by the minority opinion, is of any constructional value, except, perhaps, as indicative of the legislative view that a grossly excessive price is, within the meaning and intent of the act, a fraudulent price.

[2] Stripped of all specious and meaningless phraseology, the manifest purpose of the act is to punish with heavy penalty any dealer or other person who sells or offers to sell any article or commodity of the classes named, at a price which, in the estimation of a jury, would yield a grossly excessive profit to the seller.

[3] The act assumes that *every* article of food and of clothing is a necessity, and lays its hand upon the daintiest and most luxurious confections of food and textures and fabrications of clothing without discrimination. It extends also to *any article* which a jury may regard as "a necessity of life," without other definition, although, as a multitude of judicial decisions show, that phrase is without any certainty or meaning, and varies according to the financial and social status of the individual, as well as according to time and place. See 5 Words and Phrases, "Necessity" and "Necessary."

It must be noted, also, that it is operative without regard to any conditions of scarcity or monopoly, or trade restrictions, whether the result of unlawful combinations or agreements, or otherwise, and although other dealers than the offender may be offering the article in plentiful supply at much lower prices.

The question then is, in its last analysis, a very simple one: Does the guaranty of "liberty" as declared in section 1 of the Bill of Rights, and as preserved by the Fourteenth Amendment to the federal Constitution, protect the citizen in his right to conduct his business and sell his goods according to his own judgment and discretion, and at such prices as he may obtain, so long as the business is inherently lawful, and is honestly conducted, and is in no way devoted to a public use or affected by a public interest?

Or, may the police power of the state be constitutionally extended by legislative fiat to the conduct of private business, so as to control the prices of goods, and regulate the profits of traders, or of individuals who may wish to dispose of any article they may happen to own?

It has never been contended, so far as we are aware, that the business of selling useful and harmless commodities, to say nothing of merely casual selling, is or can be affected with a public interest, so long as trade is free and unaffected by monopolistic combinations, or artificial restraints, or emergency conditions which involve temporarily the health or safety of the public. As already noted, the operation of this act is founded upon no such conditions or considerations.

[4] During the century of Alabama's political existence, no Legislature has ever attempted to exercise the power in question— a persuasive argument that the power has never existed. We do not overlook the case of Mayor, etc., of Mobile v. Yuille, 3 Ala. 137, 36 Am. Dec. 441, decided in 1841, wherein it was held that a charter power, granted to the city of Mobile "to license bakers, and regulate the weight and price of bread," was founded upon a valid exercise of the police power, and therefore not in violation of the constitutional right of the citizen "to pursue his trade or calling in the mode his judgment might dictate." The concrete question before the court was upon the condemnation of a lot of bread because the loaves were of *less weight* than that prescribed by the proclamation of the mayor, pursuant to section 2 of an ordinance requiring "all bread to be made of good and wholesome flour; and of such weight as shall be from time to time prescribed; the loaves to be of the value of 12½ and 6¼ cents."

An examination of the charter power and ordinance as a whole shows very plainly that there was no intention to regulate the price of bread in its relation to trade profits, but merely to require the loaves to be of such weight as to sell at the prices named, the weight to be greater or less, on a graduated scale, according to the price of flour.

There was no question of price fixing or profit making before the court, but only the question of the general regulation of the business of baking bread, as related to the health, necessities, and convenience of the public. It was observed, in substance, that the practice of the *assize of bread* in municipalities had long and generally existed at common law under public and governmental sanction, and its necessity and propriety had been demonstrated by experience, from which it was concluded that such a regulation was a legitimate exercise of the police power, and that immunity against such governmental interference, never having existed, was not within the personal rights impliedly reserved to citizens under the Constitution. The Con-

stitution then in force did not contain the specific guaranty of the right to "life, liberty, and the pursuit of happiness," to be found in section 1 of the Bill of Rights in our later Constitutions, nor had the Fourteenth Amendment then been adopted.

The Yuille Case is reviewed in both the prevailing and the dissenting opinion in Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77. In the same case the state Supreme Court (Munn v. People, 69 Ill. 89, 91) it was observed by Breese, C. J., in discussing the police power over the use and enjoyment of property, that the state's right to delegate to municipalities the power "to regulate charges of hackmen and draymen, and the weight and price of bread," among other things, had never been questioned, upon which Judge Cooley remarks:

"Regulating the weight of bread is common, and necessary to prevent imposition; but regulating the price of bread we should suppose would now meet with such resistance anywhere as would require a distinct determination upon its constitutional rightfulness. How the baker can have the price of that which he sells prescribed for him, and not the merchant or day-laborer, is not apparent. Indeed, to admit the power seems to render necessary the recognition of the principle that there is and can be no limit to legislative interference but such as legislative discretion from time to time may prescribe." Cooley's Const. Law (7th Ed.) 871, note 3.

Without pursuing that particular phase of the subject further, and without affirming or denying the power to fix the price of bread under emergency conditions so grave as to present a menace to the public health and safety, it is sufficient to say that the Yuille Case lends no support to the exercise of any such power as that with which we are here concerned.

On the general subject of price regulation, Judge Cooley says:

"In the early days of the common law it was sometimes thought necessary, in order to prevent extortion, to interfere, by royal proclamation or otherwise, and establish the charges that might be exacted for certain commodities or services. The price of wages was oftener regulated than that of anything else; the local magistrates being generally allowed to exercise authority over the subject. The practice was followed in this country, and prevailed to a certain extent up to the time of independence. *Since then it has been commonly supposed that a general power in the state to regulate prices was inconsistent with personal liberty.* [The author then proceeds to a discussion of the exceptional cases in which the power may be exercised on the theory that the service, or the business, or the property, upon which the restraint is imposed is devoted to a public use or affected with a *public interest*, as exemplified particularly in Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77.] What circumstances shall affect property with a public interest is not very clear. The mere fact that the public have an interest in

the existence of the business, and are accommodated by it, cannot be sufficient, *for that would subject the stock of the merchant, and his charges, to public regulation.* The public have an interest in every business in which an individual offers his wares, his merchandise, his services, or his accommodations to the public; but his offer does not place him at the mercy of the public in respect to charges and prices." (Italics supplied.)

In the leading case of People v. Budd, 117 N. Y. 1, 22 N. E. 670, 682, 5 L. R. A. 559, 15 Am. St. Rep. 460, the court held as valid a statute regulating the price for elevating and storing grain in elevators, on the principle, as expounded in Munn v. Illinois, supra, that special conditions had arisen in that business affecting the commerce of the state and country, and *amounting to a virtual monopoly,* by which the business itself became "affected with a public interest," and therefore on common-law principles subject to reasonable public control. In People v. Budd, as in Munn v. Illinois, there was eloquent and forceful dissent; but we think that that extension of the police power, on the principle stated, must now be regarded as an established principle of American jurisprudence.

But the New York court was careful to draw the line, and it explicitly marked the boundaries beyond which the police power could not constitutionally control the citizen in the conduct of his business or vocation. Said the court:

"In determining whether the Legislature can lawfully regulate and fix the charge for elevating grain by private elevators, it must be conceded that the uses to which a man may devote his property, the price which he may charge for such use, how much he shall demand or receive for his labor, and the methods of conducting his business, are, as a general rule, not the subject of legislative regulation. These are a part of our liberty, of which, under the constitutional guaranty, we cannot be deprived. We have no hesitation in declaring that unless there are special conditions and circumstances which bring the business of elevating grain within principles which, by the common law and the practice of free governments, justify legislative control and regulation in the particular case, the statute of 1888 cannot be sustained. That no general power resides in the Legislature to regulate private business, prescribe the conditions under which it shall be conducted, fix the price of commodities or services, or interfere with the freedom of contract, we cannot doubt. The merchant and manufacturer, the artisan and laborer, under our system of government, are left to pursue and provide for their own interests in their own way, untrammeled by burdensome and restrictive regulations which, however common in crude and irregular times, are inconsistent with constitutional liberty." People v. Budd, supra, 117 N. Y. 15, 22 N. E. 675, 5 L. R. A. 566, 15 Am. St. Rep. 470, 471.

The same distinctions and limitations are noted in State v. Edwards, 86 Me. 102, 105, 29 Atl. 947, 948, 25 L. R. A. 504, 505, 41 Am. St. Rep. 528, 530, where the court said:

"The public is interested to be well and reasonably served at the store of the tradesman, the shop of the mechanic and the office of the professional man, and yet, all these vocations are private. The goods on sale in the store, material furnished by the mechanic, and the skill employed by the professional man are the individual property of each one respectively. Their vocations are exercised for their own gain, and they have a right to the fruits of their own industry without legislative control. It must not be understood that each one may not be properly subjected to suitable police regulations as to the manner of his business (2 Kent's Commentaries, 340); but the business cannot be thereby controlled and the profits to be gained therefrom destroyed, taken away or limited by the establishment of prices; otherwise we should have a paternal government that might crush out all individual liberty, and the declaration of our Constitution would become as valueless as stubble."

In the case of People v. Steele, 231 Ill. 340, 83 N. E. 236, 121 Am. St. Rep. 321, 14 L. R. A. (N. S.) 361, the court held as unconstitutional an act prohibiting the sale of a ticket by the manager of a theater without carrying on its face an inhibition against its resale *at an advance,* and prohibiting such a resale, or keeping a place for carrying on such a business. Said the court:

"The broker's business is prohibited because it has been made unlawful to make a profit. The public is no better nor worse off in health, morals, security or welfare. These are arbitrary and unreasonable interferences with the rights of the individuals concerned. The business of the broker in theater tickets is no more immoral or injurious to the public welfare than that of the broker in grain or provisions. If he does not make the price satisfactory to intending purchasers, they are under no compulsion to buy. They have no right to buy at any price except that fixed by the holder of the ticket. The manager may fix the price arbitrarily and may raise or lower it at his will."

Our own court has never had occasion until now to deal with a legislative attempt to extend the police power of the state into the field of private business by the regulation of the prices to be charged and the profits to be taken by the manufacturer of or dealer in articles of trade, or by a casual owner who may wish to sell. We have no fault to find with the authorities cited in the dissenting opinion of Mr. Justice Thomas, illustrative of the nature and extent of the police power. It will be found, however, that without a single exception they are cases involving the control of property or business which is *devoted to a public use,* or affected *with a public interest,* as those terms have been broadly defined by the courts. An excellent and comprehensive classification of those cases will be found in People v. Steele, 231 Ill. 340, 83 N. E. 236, 121 Am. St. Rep. 321, 14 L. R. A. (N. S.) 361. None of them are applicable to

a case like this, and we have searched the authorities in vain to find a single expression from any American court which tends in any way to support the contention that such a regulation is a valid exercise of the police power. Nor, indeed, are we able to perceive how such a contention, apart from the merely colorable imputation of fraud, can be seriously made.

It is certain that, if the police power can regulate prices and profits in private business, or in casual transactions, whether directly by arbitrary schedules, or indirectly by the discretion of juries, by the simple expedient of branding as fraudulent any price that may be deemed grossly excessive by a jury, then the same power can, by the same expedient, control the selling price of every commodity, and the compensation to be paid for every kind of labor and professional service. This would be practical socialism and it would be the end of the American ideal of personal liberty as understood and enjoyed for more than a century under constitutional guaranties designed to protect the citizen against arbitrary and unnecessary governmental interference.

This court has more than once had occasion to vindicate those guaranties against legislation which sought to restrict the liberty of contracting, and the right to conduct a private business in the manner deemed best by its owner, notably in Joseph v. Randolph, 71 Ala. 499, 46 Am. Rep. 347, and Toney v. State, 141 Ala. 120, 37 South. 332, 67 L. R. A. 286, 109 Am. St. Rep. 23, 3 Ann. Cas. 319 (labor contract cases) ; and in City Council of Montgomery v. Kelly, 142 Ala. 559, 38 South. 67, 70 L. R. A. 209 (the trading stamp case).

In Joseph v. Randolph, supra, the court said :

"This act has none of the characteristics of a law designed to regulate these or kindred subjects, which properly fall within the purview of domestic police. *There can be nothing so injurious or offensive in the act of hiring a single unemployed laborer, for one's service, as to require police regulation by the state.*"

In Toney v. State, supra, the court quoted with approval from the case of State v. Goodwill, 33 W. Va. 179, 10 S. E. 285, 6 L. R. A. 621, 25 Am. St. Rep. 863, this significant language:

" 'A person living under the protection of this government has the right to adopt and follow any lawful industrial pursuit not injurious to the community which he may see fit. And as incident to this is the right to labor or employ labor, make contracts in respect thereto upon such terms as may be agreed upon by the parties,' etc. * * * 'The right to buy and sell property, and contract in respect thereto, including contracts for labor * * * is protected by the Constitution. If the Legislature without any public necessity has the power to prohibit or restrict the right of contract between private persons in respect of one lawful trade or business, then it may

prevent the prosecution of all trades, and regulate all contracts.' "

In the same case this court approved also this passage from the opinion of Bradley, J., in Butcher's Union Co. v. Crescent City Co., 111 U. S. 746, 4 Sup. Ct. 652, 28 L. Ed. 585:

" 'The right to follow any of the common occupations is an inalienable right.' It was formulated as such under the phrase 'pursuit of happiness' in the declaration of independence which [as does our own Bill of Rights] commenced with the fundamental proposition that all men are created equal, that they are endowed by their Creator with certain inalienable rights; that among these are 'life, liberty and the pursuit of happiness.' * * * I hold that the liberty of pursuit—the right to follow any of the ordinary callings of life—is one of the privileges of a citizen of the United States."

In Allgeyer v. Louisiana, 165 U. S. 578, 579, 17 Sup. Ct. 427, 41 L. Ed. 832, it was declared that that right is one of the privileges protected by the Fourteenth Amendment, and that—

"In the privilege of pursuing an ordinary calling or trade and of *acquiring, holding and selling property*, must be embraced the right to make all proper contracts in relation thereto." (Italics supplied.)

In Toney v. State, supra, it was also declared that notwithstanding the right of the state to enact all needful legislation in conservation of public order, morals, health and safety, "a constitutional right cannot be impaired or destroyed under the guise or device of being regulated."

In City Council of Montgomery v. Kelly, supra, the court quoted with approval the following language:

"The pursuit of the ordinary callings of life can only be so far restrained and regulated as such restraint and regulation may be required to prevent the doing of damage to the public, or to their persons: Tiedeman's Limitation of Police Power, p. 273," and "the Legislature may not, under the guise of protecting the public interest, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations." Lawton v. Steele, 152 U. S. 137, 14 Sup. Ct. 499, 38 L. Ed. 385.

It is, of course, to be conceded that the courts have never undertaken to lay down any general rule by which the boundaries of the police power may be determined in all cases. Nevertheless, the courts are all agreed that there are fields of business and private conduct which are clearly and unmistakably beyond those boundaries, and to which the power cannot be constitutionally extended. Lochner v. New York, 198 U. S. 45, 25 Sup. Ct. 539, 49 L. Ed. 937, 3 Ann. Cas. 1133, presenting a particularly clear and comprehensive discussion of the subject.

The Lever Act reviewed in the dissenting

opinion, was strictly a war measure, designed to aid the government in its prosecution of the World War. Whether its attempt to regulate commodity prices, even in such an emergency, would have been sustained by the federal Supreme Court is a matter of conjecture, for it was stricken down on a narrower constitutional ground, and the major question was not considered. In any aspect, its enactment and annulment are of no value in the consideration of the instant case.

[5] In our judgment this Act, in so far as it relates to the prevention and punishment of profiteering, as defined in section 2, is a clear abuse of the police power, and is offensive to the declarations and guaranties of our Bill of Rights, and also to the Fourteenth Amendment to the federal Constitution; and we hold it, to that extent, unconstitutional and void.

In this view of the act it is not necessary to deal with other phases of its constitutionality, as discussed at length in the dissenting opinion, and we therefore pretermit any discussion of them here.

Let this opinion be duly certified to the Court of Appeals.

[6] To the above opinion of the Supreme Court Justices McCLELLAN and THOMAS dissent. The latter in an exhaustive dissenting opinion gives expression of his views on the questions involved, but as this court is bound by the majority opinion we feel that no good purpose can be obtained by incorporating herein this dissenting opinion. It has well been said that the views of the individual judges are of no concern unless such views are adopted at least by a majority of the court.

As a result of the opinion of the Supreme Court herein rendered, supra, and upon authority of same, the judgment of the lower court appealed from is affirmed.

Affirmed.

Justices McCLELLAN and THOMAS dissented to the response of the Supreme Court above set forth. The following is the dissenting opinion written by THOMAS, J.:

THOMAS, J. (dissenting). As provided by statute (Acts 1911, p. 449; 1 Ala. App. 10), the Court of Appeals certifies to this court the abstract question of the constitutionality of the act approved September 30, 1919 (Acts 1919, p. 1088).

Is the act violative of the Tenth or Fourteenth Amendments to the Constitution of the United States, or of sections 6, 7, or 22 of the Constitution of Alabama?

The act for construction is entitled "An act to define trusts, monopolies, combines, profiteering and unlawful acts in hoarding, cornering or storing commodities with the purpose and intent to probably influence the price of food, commodities or any necessities of life and to fix civil and criminal liabilities,

penalties or punishment and to provide remedies for the enforcement in such cases." By section 1 thereof a trust or combine is declared to "include any combination or agreement or the information of any plan or design, express or implied, between corporations, firms or individuals, or any two or more of them," in the instances specifically stated:

(a) To restrict or reduce the output or production or to increase the price of any article or commodity of food, clothing, fuel or other necessity of life or to attempt to acquire a monopoly therein within the state; (b) to prevent or restrict competition in the manufacture, marketing, transportation, selling or purchasing of any produce, commodity or necessity of life; (c) to fix a price on any article or commodity of food, clothing, fuel or other necessity of life which is not regulated by the supply of or the demand for such commodity or necessity of life; (d) to preclude, restrict or embarrass the freedom of commerce or the competition in trade of any commodity or necessity of life by pooling or hoarding the same.

In section 2 profiteering is defined to mean "the selling or offering for sale of any article or commodity of food, clothing, fuel or other necessity of life with the intent of obtaining fraudulent or grossly excessive price over its true or intrinsic worth;" and it was further declared that "in the ascertainment of whether such price is fraudulent or grossly excessive regard may be had to the cost price of said article or commodity to the person selling or offering the same; or evidence may be given of the cost price on the market of articles, commodities or necessities of like kind or character."

Section 3 defines a monopoly as meaning "any person, firm or corporation or a combination of the same who shall undertake to purchase or in any way or manner get possession or control of any article or commodity of food, clothing, fuel or other necessity of life for the purpose of withholding the same from the regular and due course of trade with the intent of affecting the price thereof."

In section 4 it is declared that it shall be unlawful for any person, firm or corporation to be or remain a party to any profiteering, trust, combine or monopoly, or to hoard in any way or manner any foodstuff or other necessity of life for the purpose of profitably affecting the price of such article in this state; declares the venue of actions in this state as stated; and that actions may be maintained (section 5) in manner therein indicated; and provided that a violation of the same shall be a misdemeanor, and upon conviction punished by fine or imprisonment. (Section 6); whether the party sued violated any provision of this act is made a question for the jury in section 7; and that the terms of the act shall be liberally construed to sup-

press the mischief aimed at and to advance the remedy is provided in section 9. The act, taking effect upon its approval, is declared to be supplementary legislation, but repeals "all laws in conflict" therewith (section 11); and that "any part of provision of this act held to be unconstitutional shall not be held to effect the remainder" of the act, section 13. Section 12 declares that the act "is not intended and shall not apply to persons holding foodstuffs, farm products or necessities of life raised by themselves or on their own premises, or to persons holding the same for such persons."

It may be said at the outset that the exemption provided in section 12 is not for decision—whether it is founded on a proper classification, rests upon a reasonable basis, is not essentially arbitrary, and does not deny the equal protection of the law to other classes not so exempt. Davis v. State, 68 Ala. 58, 44 Am. Rep. 128; Mangan v. State, 76 Ala. 60; City of Mobile v. Orr, 181 Ala. 308, 61 South. 920, 45 L. R. A. (N. S.) 575; Denson v. Ala. F. & I. Co., 198 Ala. 383, 393, 73 South. 525; Yick Wo v. Hopkins, 118 U. S. 356, 371, 6 Sup. Ct. 1064, 30 L. Ed. 220. See Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 22 Sup. Ct. 431, 46 L. Ed. 679, 690; Truax v. Corrigan, 257 U. S. 312, 42 Sup. Ct. 324, 66 L. Ed. 254. Nor do we decide whether the provision of section 7 is an invasion of the judicial power of section 42, art. 3, Constitution of Alabama, and applicable parts of article 6.

The maxim "noscitur a sociis" is that general specific words which are capable of an analogous meaning, being associated together, take color from each other, so that the general words are restricted to a sense analogous to that of the less general. State v. W. U. T. Co., 196 Ala. 570, 572, 573, 72 South. 99 Would this rule of construction declare that under the provisions of section 2 of the statute a fraud is committed in selling, or is sought to be committed in offering for sale, any article or commodity of food, clothing, fuel, or other necessity of life *with the intent* of obtaining a fraudulent or grossly excessive price over its true or intrinsic worth? Such fraud or cheat, or the attempt to commit such offense, is made the subject of the criminal punishment or civil suit as provided in sections 5 and 6. It is elementary that the word "and" be interpreted as disjunctive, and the word "or" as conjunctive when the sense of a penal statute absolutely requires. State v. Brandt, 41 Iowa, 593, 614; State v. Smith, 46 Iowa, 670, 673; Rolland v. Commonwealth, 82 Pa. 306, 22 Am. Rep. 758; State v. Pool, 74 N. C. 402, 404; Bollin v. Shiner, 12 Pa. 205, 206; State v. Custer, 65 N. C. 339, 342; State v. Kerr, 3 N. Dak. 523, 58 N. W. 27; Fowler v. Padget, 7 Term. R. 509; State v. Philbin, 38 La. Ann. 964–966; Pollock v. The Laura (D. C.) 5 Fed. 133, 135; United States v. Moore (D. C.) 104 Fed. 78. A prop-

er construction of the instant statute is that a sale, or offer of sale, with the intent of cheating and defrauding, as indicated, is made a misdemeanor. It is not a statute to fix prices.

The subjects and purposes of regulation under the police power of government have been often discussed by the courts. For example, the police power has been held to extend to the regulation of slaughtering cattle and of market places (Butchers' Union, etc., Co. v. Cresent City Co., 111 U. S. 746, 4 Sup. Ct. 652, 28 L. Ed. 585; Petz v. Detroit, 95 Mich. 169, 54 N. W. 644); regulation of the business of mining (Wolf v. Smith, 149 Ala. 457, 42 South. 824, 9 L. R. A. [N. S.] 338); prohibiting of consolidation of competing and parallel lines of railway (L. & N. R. R. Co. v. Kentucky, 161 U. S. 700, 16 Sup. Ct. 714, 40 L. Ed. 849); regulation of liability for destruction by fire caused by engines (St. L. & S. F. R. Co. v. Mathews, 165 U. S. 1, 17 Sup. Ct. 243, 41 L. Ed. 611); prescribing the manner in which railway crossings shall be kept in repair (Chicago Co. v. Nebraska, 170 U. S. 57, 74, 18 Sup. Ct. 513, 42 L. Ed. 948); regulation of killing and importing game (Magner v. People, 97 Ill. 320); regulation of telephone rates (Hockett v. State, 105 Ind. 256, 259, 5 N. E. 178, 55 Am. Rep. 201); regulation of the pressure of natural gas transported in pipes (Jamieson v. Indiana Gas & Oil Co., 128 Ind. 566, 28 N. E. 76, 12 L. R. A. 656, 660); requirement of street railways to sprinkle their tracks (State v. Railroad Co., 50 La. Ann. 1189, 24 South. 265, 56 L. R. A. 287); declaring on validity of tax to raise money to preserve public health (Davock v. Moore, 105 Mich. 133, 63 N. W. 424, 28 L. R. A. 788); regulation of the construction of sewers from adjoining townships (Millburn v. South Orange, 55 N. J. Law, 262, 26 Atl. 75); prescribing the method of the use of land for burial purposes (Newark v. Watson, 56 N. J. Law, 673, 29 Atl. 487, 24 L. R. A. 843); regulation of the storing of gunpowder within designated limits (Davenport v. Richmond City, 81 Va. 642, 59 Am. Rep. 694); requiring of property owners to keep sidewalks free of ice and snow (Carthage v. Frederick, 122 N. Y. 277, 25 N. E. 480, 10 L. R. A. 178, 19 Am. St. Rep. 490); requiring and maintenance of safe cattle guards-and crossings (Birmingham R. R. Co. v. Parsons, 100 Ala. 665, 13 South. 602, 27 L. R. A. 263, 46 Am. St. Rep. 92); requiring foreign corporations to appoint a resident agent (Am. U. Tel. Co. v. W. U. T. Co., 67 Ala. 26, 42 Am. Rep. 90); regulation of traffic at and about depots, including the soliciting of patronage by cab drivers (Ex parte Bizzell, 112 Ala. 210, 21 South. 371); regulation of the sale of seed cotton (Davis v. State, 68 Ala. 63, 44 Am. Rep. 128); and of the sale of milk (Ridgeway v. City of Bessemer, 9 Ala. App. 470, 64 South. 189; Mayor & Aldermen v. Goldstein, 151 Ala. 473, 44 South. 113); prevention of

stock running at large (Folmer v. Curtis, 86 Ala. 354, 5 South. 678); licensing of occupations generally (Van Hook v. Selma, 70 Ala. 363, 45 Am. Rep. 85; 2 Dillon on Mun. Corp., §§ 660, 731; Standard Chem. & Oil Co. v. Troy, 201 Ala. 89, 91, 77 South. 383, L. R. A. 1918C, 522; Jones v. State, 17 Ala. App. 444, 85 South. 839); regulations in cities, mines, and watersheds (Block v. Hirsh, infra, p. 533).

Approaching the main question for decision, it must be conceded of our dual system of government that there is inherent authority under the police power: (1) To pass laws necessary to protect the property and the morals, as well as the lives, of the people, and to promote the public convenience and general prosperity; and that statutes having that effect and purpose have not been held invalid because incidentally affecting commerce between the states, except only as Congress has interposed restraint. L. & N. v. State, 16 Ala. App. 199, 206, 76 South. 505. (2) That the paramount authority of Congress enables it to intervene, at discretion, for the complete and effective government of that which has been committed to its care, and to this extent, in response to a conviction or national need, Congress may displace local laws by substituting laws of its own. L. & N. v. State, 16 Ala. App. 207, 76 South. 505, where federal authorities are collected. (3) Though Congress may have enacted a law relating to a subject on which a state may legislate, yet, if it be a limited enactment to such extent is the subject left to state regulation, where enforcement of the state statute can be had without embarrassment to the enforcement of the federal law, the state enactment will be permitted to operate in aid of the federal. L. & N. v. State, 16 Ala. App. 207, subd. 8, 76 South. 505. (4) In determining whether a federal statute has superseded a state enactment, the entire scope and purpose of the statute must be considered, and that which needs to be implied within its statutory scope and intent is of no less force than that which is expressed in the act. When so considered, if the federal statute, in its chosen field of operation, will be "frustrated," and its provisions "refused their natural effect," the state law must yield to the superior authority of the federal law within the sphere of its delegated and assumed authority. Texas & Pacific v. Abilene Cot. Oil. Co., 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075; Northern Pacific v. Washington, 222 U. S. 370, 377, 32 Sup. Ct. 160, 56 L. Ed. 237; Southern Railway v. Reid, 222 U. S. 424, 32 Sup. Ct. 140, 56 L. Ed. 257; Savage v. Jones, 225 U. S. 501, 32 Sup. Ct. 715,. 56 L. Ed. 1183. That is to say, if the state statute has such indirect and incidental effect on the enforcement or abeyance of the federal statute, the state law can have no validity. Northern Pacific v. Washington, supra; Southern Railway v. Reid, supra; Asbell v. Kansas, 209 U. S.

251, 28 Sup. Ct. 485, 52 L. Ed. 778, 14 Ann. Cas. 1101. It should be observed in this connection that the intent to supersede, by the federal act, the exercise by the state of its police power, as to matters not covered by federal legislation, is not to be inferred from the "mere fact that Congress has seen fit to circumscribe and to occupy a limited field." Savage v. Jones, supra; A. C. L. v. Georgia, 234 U. S. 280, 34 Sup. Ct. 829, 58 L. Ed. 1312; M. K. & T. v. Harris, 234 U. S. 412, 34 Sup. Ct. 790, 58 L. Ed. 1377, L. R. A. 1915E, 942.

Where the issue is whether a state statute, in its application to facts which are set out in the pleading and admitted by demurrer, violates the Fourteenth Amendment, the Supreme Court of the United States will "analyze the facts as averred and draw its own inferences as to their ultimate effect" upon the rights and immunities of citizenship so protected, "and is not bound by the conclusion of the state Supreme Court in this regard." There is, however, in such case a respect in which the Supreme Court of the United States is "bound by the judgment of the state Supreme Court"—the construction which the state court puts upon the statute. Truax v. Corrigan, 257 U. S. 312, 42 Sup. Ct. 124, 66 L. Ed. 254. However, in the finding of the state court as to the facts "when the conclusion of law and findings of fact are so intermingled as to make it necessary, in order to pass upon the question," the Supreme Court of the United States will analyze the facts, when this is necessary to pass upon the constitutional question for decision. Jones Nat. Bank v. Yates, 240 U. S. 541, 552, 553, 36 Sup. Ct. 429, 60 L. Ed. 788; Northern P. R. Co. v. North Dakota, 236 U. S. 585, 593, 35 Sup. Ct. 429, 59 L. Ed. 735, L. R. A. 1917F, 1148, 1158, 1159, Ann Cas. 1916A, 1; Truax v. Corrigan, supra.

With this general statement of the respective jurisdictions and powers of state and federal authority, it is interesting to note that by the act of August 10, 1917, and the amendment thereto or re-enactment of October, 22, 1919 (volume 41, part 1, Public Laws, U. S. Stat. at L. 66 Cong. p. 297 et seq.; vol. 40, pp. 276–278), of what is called the "Food Control Act Amendments," the federal government sought to enter this important field and deal with the subject and some of the objects embraced in the provisions of the state statute now submitted for construction. The reason for the federal statute was declared to be the existence of a state of war, and that it was deemed essential "to the national security and defense, for the successful prosecution of the war and for the support and maintenance of the army and navy, to assure an adequate supply and equitable distribution, and to facilitate the movement of foods, feeds, wearing apparel * * * in this act called necessaries; to prevent, locally or generally, scarcity, monopolization, hoarding, injurious speculation, manipula-

tion, and private controls, affecting such supply, distribution. and movement; and to establish and maintain governmental control of such necessaries during the war." Lawrenceburg Co. v. Jones, 204 Ala. 59, 85 South. 719. The economic conditions growing out of the war were the reasons that induced the passage of the instant statute by the Legislature of Alabama. Block v. Hirsh, 256 U. S. 135, 41 Sup. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165.

In U. S. v. Cohen Groc. Co., 255 U. S. 81, 41 Sup. Ct. 298, 65 L. Ed. 516, 14 A. L. R. 1045, Mr. Chief Justice White, delivering the opinion, held that the price at which a commodity is sold is comprehended by the provision of the Lever Act of August 10, 1917, as re-enacted by the law of October 22, 1919, making it unlawful for any person willfully to make any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries, or to conspire to exact excessive prices therefor; and that the mere existence of a state of war was not authority to suspend or change the operation upon the power of Congress, or of the guaranties and limitations of the United States Constitution (Fifth and Sixth Amendments), as to delegating legislative power to courts and juries, penalizing indefinite acts, and depriving citizens of the right to be informed of the nature and cause of accusations against them. It was further held that the federal act violated the Fifth and Sixth Amendments to the Constitution of the United States, requiring an "ascertainable standard of guilt," fixed by Congress rather than by courts and juries, and securing to accused persons the right to be informed of the nature and cause of accusations against them. It is of interest to note that by the recent case of American Column & Lumber Co. v. U. S., 257 U. S. 377, 42 Sup. Ct. 114, 66 L. Ed. 284 (decided December 19, 1921, U. S. Sup. Ct.) and that of Federal Trade Comm. v. Beechnut Pkg. Co., 257 U. S. 441, 42 Sup. Ct. 150, 66 L. Ed. 307 (decided January 3, 1922) attempts were condemned to fix prices through restrictive agreements, and to which we will later advert. See, also, the "Rent Case," Block v. Hirsh, supra, where under police power the tenant was given the privilege of holding over after expiration of the lease so long as he paid the rent and performed the conditions as fixed by the lease or as modified by the commission—justified under the right to make temporary legislation meet the emergencies caused by the war, etc. Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77.

In Twining v. New Jersey, 211 U. S. 78, 29 Sup. Ct. 14, 53 L. Ed. 97, 103, Mr. Justice Moody demonstrated that the first 10 amendments to the Constitution of the United States were limitations upon Congress, and not upon the Legislatures of the several States. Banks v. State (Ala. Sup.) 93 South. 293.[1] Therefore the Alabama statute in

[1] 207 Ala. 179.

question is not to be tested by either of the first 10 amendments to the Constitution of the United States.

The real inquiry propounded by the Court of Appeals, as affecting the rights of citizenship, is whether the statute violates the Fourteenth Amendment by abridging the privileges or immunities of citizens of the United States, or by depriving any person of his life, liberty, or property without due process of law, or denying to any person within its jurisdiction the equal protection of the law. In order to bring a defendant within the protection of this clause of the Constitution, it must be shown (1) that a right, privilege, or immunity is guaranteed by the federal Constitution against impairment by the state; and (2), if so, that the rights, privileges, or immunities so guaranteed would be impaired or denied by an enforcement of the state statute. That is to say, as a citizen of the United States and of his state of residence, the rights of citizenship declared by the Fourteenth Amendment not to be abridged are that *no state* shall (1) make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any state (2) deprive any person of his life, liberty, or property without due process of law, (3) nor deny to any person within *its jurisdiction* the equal protection of the law.

The effect of the Fourteenth Amendment is said to withdraw from the states powers theretofore enjoyed by them to an extent not yet fully ascertained, "limited those powers and restrained their exercise," and that "whenever a new limitation or restriction is declared, it is a matter of grave import, since, to that extent, it diminishes the authority of the state, so necessary to the perpetuity of our dual form of government, and changes its relation to its people and to the Union." Twining v. New Jersey, supra.

On writ of error to the Supreme Court of the state of Arizona to review a decree which sustained a decree of the superior court for Cochise county in that state, sustaining a demurrer to and dismissing the complaint in a suit seeking injunctive relief in an industrial dispute, Mr. Chief Justice Taft, in Truax v. Corrigan, supra, speaks of the guaranty of the Fourteenth Amendment as follows:

"It is true that no one has a vested right in any particular rule of the common law, but it is also true that the Legislative power of a state can only be exerted in subordination to the fundamental principles of right and justice which the guaranty of due process in the Fourteenth Amendment is intended to preserve, and that a purely arbitrary or capricious exercise of that power whereby a wrongful and highly injurious invasion of property rights, as here, is practically sanctioned and the owner stripped of all real remedy, is wholly at variance with those principles."

Of the provisions of that amendment forbidding a state to deny to any person the equal protection of the law, it is said:

"The clause is associated in the amendment with the due process clause and it is customary to consider them together. It may be that they overlap, that a violation of one may involve at times the violation of the other, but the spheres of the protection they offer are not coterminous. The due process clause brought down from Magna Charta was found in the early state Constitutions and later in the Fifth Amendment to the federal Constitution as a limitation upon the executive, legislative and judicial powers of the federal government, while the equality clause does not appear in the Fifth Amendment and so does not apply to congressional legislation. The due process clause requires that every man shall have the protection of his day in court and the benefit of the general law, a law which hears before it condemns, which proceeds not arbitrarily or capriciously, but upon inquiry, and renders judgment only after trial, so that every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society. Hurtado v. California, 110 U. S. 516, 535, 4 Sup. Ct. 111, 292, 28 L. Ed. 232, 238. It, of course, tends to secure equality of law in the sense that it makes a required minimum of protection for every one's right of life, liberty, and property, which the Congress or the Legislature may not withhold."

And it was said further that—

"The equality clause of the Fourteenth Amendment does not apply to congressional, but only to state action." Truax v. Corrigan, supra.

Is the act in question one depriving a citizen of the United States or of this state of the right of ownership, proper control, contract or sale of personal property? Does it abridge any privilege or immunity of a citizen of the United States as to the same guaranteed by the federal Constitution? Does it deprive "any person" of his property without due process of law, or deny to any person within the jurisdiction of the state the equal protection of the law in the due exercise of the right of ownership of said property as regulated or denied by section 2 of the Alabama statute?

The statute defines and regulates the right of contract that is declared fraudulent and a violation of section 2 by a sale or offer of sale of personal property contrary to its provisions. Analogous classifications, rested on a reasonable basis and not essentially arbitrary, are found in several of our statutes, to wit: The provision for cattle guards to be erected and maintained by railroad corporations or persons operating railroads (Code, §§ 5513, 5654; A. & St. A. B. Ry. Co. v. Fowler, 192 Ala. 373, 68 South. 283; Birmingham M. R. R. Co. v. Parsons, 100 Ala. 662, 13 South. 602, 27 L. R. A. 263, 46 Am. St. Rep. 92; Ex parte Hines, 205 Ala. 17, 22, 87 South. 691); racing and reckless driving on public thoroughfares (Code, § 7728; Parker v. State, 1 Ala. App. 244, 55 South. 330); offenses concerning causeways and bridges and permitting bridges over public highways to remain out of repair (Code, § 7731); against direct-

ly or indirectly forming pools, combinations, or monopolies (Code, §§ 7579–7582; Sou. Cotton Oil Co. v. Knox, 202 Ala. 694, 81 South. 656; Code, § 2487; Tallassee Oil & F. Co. v. Holloway, 200 Ala. 492, 76 South. 434, L. R. A. 1918A, 280); concealing identity (section 6937); false pretense and fraud (Code, §§ 6920, 6925; Dennis v. State, 16 Ala. App. 115, 75 South. 707); requiring railroads to provide "good lights" and a sufficiency of good drinking water (Code, § 7660; Dean v. State, 149 Ala. 34, 43 South. 24; Id., 154 Ala. 77, 45 South. 651); the labor statute (Code, § 6845; Bailey v. State, 161 Ala. 75, 49 South. 886; Id., 219 U. S. 219, 31 Sup. Ct. 145, 55 L. Ed. 191); recklessly handling firearms or other weapon on a passenger train (Code, § 7681); boarding house statute (Code, § 6934; Acts 1915, p. 152; Ex parte King, 102 Ala. 182, 15 South. 524; selling liquor, arms, etc., during riot and before public notice is given for opening such business after the riot (Code, § 7723); unlawful assemblies (Code, § 7721); the future contract statutes (Code, § 3349; Acts 1915, p. 913; Thorn v. Browne, 257 Fed. 519); to prevent fraud in "packing cotton" (Code, § 6683; Daniel v. State, 61 Ala. 4; Wallace v. Crosthwait, 196 Ala. 356, 71 South. 666); the inspection, regulation, and licensing statutes for municipalities (Code, § 1338 et seq.; Ward v. Markstein, 196 Ala. 209, 72 South. 41; Ex parte Rowe, 4 Ala. App. 254, 59 South. 69); trading in farm products between sunset and sunrise (Code, § 6878). The constitutionality of such police statutes was affirmed (Davis v. State, 68 Ala. 58, 44 Am. Rep. 128); declared not offensive to section 7, article 1, Const Ala. 1875; section 6, article 1, Const. Ala. 1901; or Fourteenth Amendment to the Constitution of the United States. And this court said of the farm products statute (Mangan v. State, 76 Ala. 60) that it was a legitimate exercise of legislative power, and not an unauthorized interference with the rights of private property or violative of the Fourteenth Amendment to the Constitution of the United States. Other cases of the valid exercise of the police powers by the State are collected in Southern Express Co. v. Whittle, 194 Ala. 406, 435, 69 South. 652, L. R. A. 1916C, 278; State v. Mattox Cigar & Tob. Co., 201 Ala. 229, 77 South. 755; Standard Chem. & Oil Co. v. Troy, 201 Ala. 89, 77 South. 383, L. R. A. 1918C, 522; Mobile v. Yuille, 3 Ala. 137, 36 Am. Dec. 441; Ex parte City of Birmingham, 201 Ala. 641, 79 South. 113; City of Troy v. Western U. T. Co., 164 Ala. 482, 486, 51 South. 523, 27 L. R. A. (N. S.) 627.

Statutes and ordinances—other than for the punishment of the criminal—as for the condemnation of the res, in aid of the enforcement of the prohibition laws, to prevent larceny, burglary, counterfeiting, etc., have been upheld, and may properly "curtail the rights of innocent persons (1) as interfering with their rights of purchase and receipt of property, or (2) as limiting and regulating

their powers of enjoyment and disposal of their own property." New Mexico v. Brooken, 19 N. M. 404, 143 Pac. 479, Ann. Cas. 1916D, 136, L. R. A. 1915B, 213, and notes. For example, statutes and ordinances regulating the business of pawnbrokers, junk dealers, and the like, although such regulations indirectly curtail the salability of property in the hands of the owner; such regulations belong, in general to the first class; and statutes and ordinances to the second class, in which the owner of property is forbidden to keep, use, remove or sell the same in other than certain reasonable manner indicated by the law. State v. Mattox Cigar & Tob. Co., supra, where the federal authorities are collected. See notes to New Mexico v. Brooken, supra; Davis v. State, supra; Mangan v. State, supra; Mobile v. Orr, 181 Ala. 308, 61 South. 920, 45 L. R. A. (N. S.) 575; Harris v. Barrett, 89 South. 717; [2] State ex rel. Black v. Delaye, 193 Ala. 500, 68 South. 993, L. R. A. 1915E, 640.

Out of the mass of decisions it has been defined and declared that the right to conduct one's lawful business without the wrongful and injurious interference of others is a valuable property right, which will be protected, if necessary by injunctive process. Hardie-Tynes Mfg. Co. v. Cruise, 189 Ala. 66, 66 South. 657. A recent decision of this court on the question of the protection of this property right is contained in Franklin Social Club v. Phil Campbell, 204 Ala. 259, 85 South. 527, where it is declared:

"In Dobbins v. Los Angeles, 195 U. S. 223, 25 Sup. Ct. 18, 49 L. Ed. 169, it is said that, while it is admitted that every intendment must be made in favor of the lawfulness of the exercise of municipal power making regulations to promote the public health and safety, and while it is not the province of the courts, except in clear cases, to interfere with the exercise of the power reposed by law in municipal corporations for the protection of local rights and the health and welfare of the people in the community—notwithstanding this general rule of the law, it is now thoroughly well settled by the decisions of that court that municipal by-laws and ordinances' undertaking to regulate useful business enterprises are subject to investigation in the courts with a view to determining whether the law or ordinance is a lawful exercise of the police power, or whether, under the guise of enforcing police regulations, there has been an unwarranted and arbitrary interference with the constitutional rights to carry on a lawful business, to make contracts, or to use and enjoy property." L. R. A. 1918D, 1007.

It is established by state and federal decisions that the right to sell (Dorman v. State, 34 Ala. 216, 234; State v. Mattox Cig. & Tob. Co., supra; State ex rel. v. Delaye, supra; Southern Exp. Co. v. Whittle, supra; Purity Ext. Co. v. Lynch, 226 U. S. 192, 33 Sup. Ct. 44, 57 L. Ed. 184; Clark Dist. Co. v. West.

Md. Ry. Co., 242 U. S. 311, 37 Sup. Ct. 180, 61 L. Ed. 326, L. R. A. 1917B, 1218, Ann. Cas. 1917B, 845; Mugler v. Kansas, 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205, as to prohibiting the manufacture, sale, or other disposition of liquors, whether intoxicating or not, in connection with prohibitive liquor statutes) and the right to refuse to sell is qualified—may be properly limited in the public interest (Federal Trade Comm. v. Beechnut Pkg. Co., supra). Of the correctness of this statement there is authority; as, "It would be idle and trite to say that no right is absolute" (Orient Ins. Co. v. Daggs, 172 U. S. 557, 566, 19 Sup. Ct. 281, 43 L. Ed. 552); "No conduct has such an absolute privilege as to justify all possible schemes of which it may be a part" (Aikens v. Wisconsin, 195 U. S. 194, 206, 25 Sup. Ct. 3, 6, 49 L. Ed. 154); "The word 'right' is one of the most deceptive of pitfalls; it is so easy to slip from a qualified meaning in the premise to an unqualified one in the conclusion. Most rights are qualified" (Amer. Bank & Tr. Co. v. Fed. Res. Bank, 256 U. S. 350, 41 Sup. Ct. 499, 65 L. Ed. 983). "Who are to settle the principles of eternal justice, and define the limits of so vague a thing as natural justice?" is the question on which the argument in Dorman v. State, supra, proceeded.

In a discussion of the Beechnut Case, this question was aptly urged on the Supreme Court of the United States by the Solicitor General as follows:

"The right to refuse to enter into contracts is no more absolute or sacred than the right to contract. The right to refuse to sell and the right to sell are both natural rights, but they may both be limited in the public interest. Liberty of contract is protected by the Fifth Amendment to the federal Constitution. It may be qualified, however, by legislative enactment under the commerce clause, and has been so qualified under the Sherman Law, and later by the Trade Commission Act."

The case of the United States v. Colgate, 250 U. S. 300, 307, 39 Sup. Ct. 465, 468, 63 L. Ed. 992, 997 (7 A. L. R. 443), wherein occurs the expression:

"In the absence of any purpose to create or maintain a monopoly, the act [we interpolate, the Sherman Act] does not restrict the long-recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell. The trader or manufacturer, on the other hand, carries on an entirely private business, and can sell to whom he pleases' "

—was explained in Federal Trade Comm. v. Beechnut Pkg. Co., supra. It was said that the Colgate Case was a prosecution under the Sherman Anti-Trust Act (U. S. Comp. St. § 8820 et seq.), coming to the Supreme Court of the United States under the Criminal Ap-

[2] 206 Ala. 263.

peals Act (U. S. Comp. St. § 1704), wherein the Supreme Court "must accept the construction of the indictment as made in the District Court ; and that upon such construction the only act charged amounted to the exercise of the right of the trader, or manufacturer, engaged in private business, to exercise his own discretion as to those with whom he would deal, and to announce the circumstances under which he would refuse to sell, and that thus interpreted no act was charged in the indictment which amounted to a violation of the Sherman Act." The subsequent case of U. S. v. Schrader's Son, 252 U. S. 85, 99, 40 Sup. Ct. 251, 64 L. Ed. 471, dealt with the Colgate Case under the Criminal Appeals Act, wherein there was a charge that a manufacturer sold to manufacturers in several states under an agreement to observe certain resale prices fixed by the vendor. It was said that the court below had misapprehended the meaning and effect of the opinion and judgment in the Colgate Case; that there was no intention in the Colgate Case to overrule or modify the doctrine applied in Dr. Miles Med. Co. v. Park, 220 U. S. 373, 31 Sup. Ct. 376, 55 L. Ed. 502, where the effort was to destroy the dealer's independent discretion through restrictive agreements to control prices. In the later case of Frey & Son v. Cudahy, 256 U. S. 208, 41 Sup. Ct. 451, 65 L. Ed. 892, it was said of the Colgate Case that "apparently the former case was misapprehended," and that U. S. v. Schrader's Son, supra, distinctly stated that the essential agreement, combination or conspiracy might be "implied from a course of dealing or other circumstances." Boston Store v. Am. Graph. Co., 246 U. S. 8, 21, 38 Sup. Ct. 257, 62 L. Ed. 551, Ann. Cas. 1918C, 447.

"To pronounce abnormal conduct on the part of * * * natural competitors, controlling one-third of the trade of the country in an article of prime necessity, a 'new form of competition,' and not an old form of combination in restraint of trade, as it so plainly is, would be for this court to confess itself blinded by words and forms to realities which men in general very plainly see, and understand and condemn, as an old evil in new dress and with a new name." American Column & Lumber Co. v. United States, supra.

"Jobbers and wholesale dealers who would supply the trade may not get the goods of the company, if they sell to those who do not ·observe the prices indicated or who are on the company's list of undesirables until they are restored to favor by satisfactory assurances of future compliance with the company's schedules of resale prices. Nor is the inference overcome by the conclusion stated in the Commission's findings that the merchandising conduct of the company does not constitute a contract or contracts whereby resale prices are fixed, maintained, or enforced. The specific facts found show suppression of the freedom of competition by methods in which the company secures the co-operation of its distributors and customers, which are quite as effectual as agreements express or implied intended to accomplish the same purpose. By these methods the company, although selling its products at prices satisfactory to it, is enabled to prevent competition in their subsequent disposition by preventing all who do not sell at resale prices fixed by it from obtaining its goods." Federal Trade Comm. v. Beechnut Pkg. Co., supra.

The terms of the Lever Act held indefinite and nonconstituting a fixing by Congress of an ascertainable standard of guilt and as inadequately informing a person accused of the violations thereof of the nature and cause of the accusation against him, are that "it is hereby made unlawful for any person willfully * * * to make any unjust or unreasonable rate or charge in handling or dealing in or with any' necessaries. * * *" United States v. Cohen Groc. Co., 255 U. S. 81, 41 Sup. Ct. 298, 65 L. Ed. 516, 14 A. L. R. 1045 ; Standard Chem. Corp. v. Waugh Corp., 14 A. L. R. 1054. It is said in the Cohen Case :

"* * * The section forbids no specific or definite act. It confines the subject-matter of the investigation which it authorizes to no element essentially inhering in the transaction as to which it provides. It leaves open, therefore, the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against."

In article 5 of Amendments to the Federal Constitution is contained the provision that no person shall be deprived of life, liberty, or property, without due process of law. A material part of due process of law declared in article 6—that the accused be "informed of the nature and cause of the accusation"—is not contained in the Fourteenth Amendment. The decision in the Cohen Case, supra, was rested on the failure of the statute to comply with the quoted provisions of the Fifth and Sixth Amendments, for the Chief Justice said of the defect in the quoted portions of the Lever Act:

"The section·forbids no specific or definite act. It confines the subject-matter of the investigation which it authorizes to no element essentially inhering in the transaction as to which it provides."

That is, in short, it is unconstitutional because no standard of duty had been established. That decision is not based on the provisions of the Fifth Amendment alone, also found in the Fourteenth Amendment, but the essential element of due process declared in the Sixth Amendment. The instant statute states: (1) The specific or definite act forbidden is the fraudulently selling, or fraudulently exposing for sale a necessity of life; (2) the subject-matter of the investigation (which the statute authorizes) is confined by that statute to the element of fraud (or attempt thereof) essentially inhering in the transaction of its sale or exposure for sale at so grossly excessive' price over its true and intrinsic worth, and which is declared a fraud

or cheat. This is within the police power of government. 6 R. C. L. p. 183 et seq., pars. 199, 202. The prevention of fraud and deceit, cheating and imposition, is equally within the police power. People v. Freeman, 242 Ill. 373, 90 N. E. 366, 17 Ann. Cas. 1098; People v. William Henning Co., 260 Ill. 554, 103 N. E. 530, 49 L. R. A. (N. S.) 1206; People v. Wagner, 86 Mich. 594, 49 N. W. 609, 13 L. R. A. 286, 24 Am. St. Rep. 125.

The words of section 2 of the Alabama statute for construction are different from that indefiniteness condemned in the Lever Act. It is made unlawful for any person to sell or offer for sale any necessity of life with the intent of obtaining fraudulently or grossly excessive price over its true or intrinsic worth. There is no delegation of legislative power, no leaving to the jury the ascertainment of the nature and cause of the accusation against a defendant, no depriving a person of life, liberty, or property without due process of law. True, the legislative standard of the right of contract or of its limitation beyond which the act is declared a crime is to be found in the relation between the cost price of the article or commodity to the person selling the same and that for which it is offered for sale or sold, and the cost price on the market of articles, commodities, or necessities of like kind or character. That is not such as was condemned in Bailey v. State, supra; Truax v. Corrigan, supra; Chicago, M. & St. P. R. Co. v. Minnesota, 134 U. S. 418, 10 Sup. Ct. 702, 33 L. Ed. 970; Corn Products Ref. Co. v. Eddy, 249 U. S. 427, 39 Sup. Ct. 325, 63 L. Ed. 689; Engler v. Kansas, supra.

When the instant statute is contrasted with the Lever Act, there is not that analogy between section 2 and the provision of the act of Congress condemned (section 4 of the original act, as amended by section 2 of the act of 1919), such as to bring the Alabama statute within the controlling influence of U. S. v. Cohen Groc. Co., supra. The necessary tests were supplied in section 2 of the Alabama statute by the declared rule of evidence; as where statutes direct adherence to market values (Internl. Harvester Co. v. Kentucky, 234 U. S. 216, 221, 34 Sup. Ct. 853, 58 L. Ed. 1284; Nash v. U. S., 229 U. S. 373, 377, 33 Sup. Ct. 780, 57 L. Ed. 1232; Collins v. Kentucky, 234 U. S. 634, 34 Sup. Ct. 924, 58 L. Ed. 1510), or to rates, etc., fixed, declared, or announced by other governmental agencies to whom legislative discretion had been given (Standard Chem. & M. Corp. v. Waugh Corp., supra; authorities collected in Johnson v. Craft, 205 Ala. 407, 87 South. 375; Arver v. U. S., 245 U. S. 366, 389, 38 Sup. Ct. 159, 62 L. Ed. 349, 358, L. R. A. 1918C, 361, Ann. Cas. 1918B, 856).

In Internl. Harvester Co. v. Kentucky, supra (writs of error to the Court of Appeals to review judgments affirming convictions in the circuit courts in that state) Mr. Justice Holmes, delivering the opinion, stated that the conviction was for having entered into an agreement with other named companies for the purpose of controlling the price of machinery manufactured by them "and of enhancing it above their *real value;* and for having so fixed and enhanced the price, and for having sold their harvesters, etc., at a price in excess of their *real value*, in pursuance of the agreement alleged." The rights of plaintiff in error were rested under the Fourteenth Amendment to the Constitution; it being contended on the one hand that the statute as construed by the Court of Appeals offered no standard of conduct possible to know; and, on the other, that in the present and earlier decisions of the state the real value was declared to be "the market value under *fair competition,* and under *normal market conditions*." 147 Ky. 566, 144 S. W. 1064; Id., 137 Ky. 668, 126 S. W. 352; Commonwealth v. International Har. Co., 131 Ky. 551, 115 S. W. 703, 33 Am. St. Rep. 256. This standard declared by the Court of Appeals of Kentucky was thus discussed by the Supreme Court of the United States:

"In order to reach what is called the real value, a price from which all effects of the combination are to be eliminated, the plaintiff in error is told that it cannot avail itself of the rise in materials because it was able to get them cheaper through one of the subsidiary companies of the combination, and that the saving through the combination more than offset all the rise in cost. * * * Value is the effect in exchange of the relative social desire for compared objects expressed in terms of a common denominator. It is a fact and generally is more or less easy to ascertain. * * * The reason [for the granting of the writ] is not the general uncertainties of a jury trial but that the elements necessary to determine the imaginary ideal are uncertain both in nature and degree of effect to the acutest commercial mind." Pages 1287, 1288.

These necessary elements to determine the fact, for the lack of which in the Kentucky statute it was denominated an "imaginary ideal," are supplied by the Alabama statute, and rendered certain both "in nature and degree of effect to the acutest commercial mind" by the reasonable rule of evidence declared, to wit, (1) The cost price of the article or commodity to the persons selling or offering the same for sale, together (2) with the cost price on the market of articles, commodities, or necessities of like kind or character. This latter element of market value was not supplied by the Kentucky statute. It was "market value under (a) fair competition, and (b) under *normal* market conditions;" and this double ascertainment or conjecture of *normal* conditions and fair competition as elements of market value, was condemned as the requirement by statute of the ascertainment of an "imaginary ideal" in International Harvester Co. v. Kentucky, supra. That this is the true interpretation,

by the Supreme Court of the United States, of the defect found in the Kentucky statute under the Fourteenth Amendment to the Constitution, is indicated by Mr. Justice Holmes as follows:

"We regard this decision as consistent with Nash v. United States, 229 U. S. 373, 377, 57 L. Ed. 1232, 1235, 33 Sup. Ct. 780, in which it was held that a criminal law is not unconstitutional merely because it throws upon men the risk of rightly estimating a matter of degree—what is an undue restraint of trade. That deals with the actual, not with an imaginary condition other than the facts. It goes no further than to recognize that, as with negligence, between the two extremes of the *obviously illegal* and the *plainly lawful* there is a gradual approach and that the complexity of life makes it impossible to draw a line in advance without an artificial simplification that would be unjust. The conditions are as permanent as anything human, and a great body of precedents on the civil side, coupled with familiar practice make it comparatively easy for common sense to keep to what is safe." Internl. Har. Co. v. Kentucky, supra.

It is thus conceded that a standard fixed by market value is admissible and just, and that the Kentucky statute was condemned only because in truth it did not apply this standard, but called for an estimate of what prices would have been under nonexistent and imaginary conditions—"under *fair* competition and under *normal* market conditions."

In Collins v. Kentucky, supra (in error to the Court of Appeals of Kentucky), Mr. Justice Hughes rested the decision on Internl. Harvester Co. v. Kentucky, supra, declaring of the test that to determine his conduct, a defendant was bound to ascertain the real value (1) "not according to the actualities of life, or (2) by reference to knowable criteria, but (3) by speculating upon imaginary conditions and (4) endeavoring to conjecture what would be the value under other and so-called *normal circumstances with fair competition*, eliminating the abnormal influence of the combination itself, and of all other like combinations, and of still other combinations which these were organized to oppose." By reason of this twofold uncertainty the statute is held defective. The standard fixed by the Alabama statute was vastly different, more definite, and ascertainable, providing, as it does, a twofold security that evidence may be given of the cost price on the market, and of the "cost price of said article or commodity to the person selling or offering the same" for sale, in the ascertainment of whether such price at which it is sold or offered for sale was fraudulent and a cheat.

In the later case of Fox v. Washington, 236 U. S. 273, 35 Sup. Ct. 383, 59 L. Ed. 573 (in error to the Supreme Court of the state of Washington to review a judgment of conviction affirmed in the superior court), of editing printed matter *tending to encourage and ad-vocate disrespect for an actual breach of law*, the state statute was upheld. Mr. Justice Holmes, delivering the opinion, said:

"We understand the state court by implication at least to have read the statute as confined to encouraging an actual breach of law. Therefore the argument that this act is both an unjustifiable restriction of liberty and too vague for a criminal law must fail. * * * If the statute should be construed as going no farther than it is necessary to go in order to bring the defendant within it, there is no trouble with it for want of definiteness. See Nash v. United States, 229 U. S. 373, 57 L. Ed. 1232, 33 Sup. Ct. 780; International Harvester Co. v. Kentucky, 234 U. S. 216, 58 L. Ed. 1234, 34 Sup. Ct. 853. It lays hold of encouragements that, apart from statute, if directed to a particular person's conduct, generally would make him who uttered them guilty of a misdemeanor if not an accomplice or a principal in the crime encouraged, and deals with the publication of them to a wider and less selected audience. Laws of this description are not unfamiliar."

"Every statute is presumed to be constitutional. The courts ought not to declare one to be unconstitutional, unless it is clearly so. If there is doubt, the expressed will of the Legislature should be sustained." Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77; Weed & Co. v. Lockwood (D. C.) 264 Fed. 455, 457; State v. Moilen, 1 A. L. R. 337, note.

In Waters-Pierce Oil Co. v. Texas, 212 U. S. 86, 29 Sup. Ct. 220, 53 L. Ed. 417, the Supreme Court of the United States had before it the anti-trust statute of Texas, which contained the phrase "reasonably calculated" to fix and regulate prices, and Mr. Justice Day said of this phrase that it merely implied the commission of acts which tend to accomplish the thing prohibited by the statute; and, to the insistence that the statute was void for uncertainty, expressed the opinion that the broad power was not given to a jury to determine the criminal character of the act in accordance with their belief as to whether it is reasonable or unreasonable. If this decision left it in doubt, as to the right of a jury in a criminal case to determine the reasonableness of a rate, charge, or intent, the criminal case of Nash v. United States, supra, dispelled that doubt. The statute made the subject of consideration in that case (anti-trust act) was attacked on the grounds that it was vague and indefinite (Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. [N. S.] 834, Ann. Cas. 1912D, 734) and Mr. Justice Holmes said:

"Apart from the common law as to restraint of trade thus taken up by the statute the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death. 'An act causing death may be murder, manslaughter, or misadventure according to the degree of

danger attending it' by common experience in the circumstances known to the actor. * * * 'The criterion in such cases is to examine whether common social duty would, under the circumstances, have suggested a more circumspect conduct.' 1 East, P. C. 262."

It is thus established that this rule, long obtaining in England and in the states of the Union, has been reaffirmed and applied under the Fourteenth Amendment in criminal cases by the Supreme Court of the United States. Nash v. U. S., supra (1913); Fox. v. Washington, supra (1915); and Miller v. Strahl, 239 U. S. 426, 36 Sup. Ct. 147, 60 L. Ed. 364, an action for tort (1915).

The case of Miller v. Strahl, supra, construed a statute of Nebraska requiring innkeepers, in case of fire, to give notice to guests and inmates at once, and "to do all in their power to save" them unharmed. Because of this last clause, that statute was challenged as offensive to the Fourteenth Amendment, and Mr. Justice McKenna said:

"Could the statute exact less? It is the dictate of humanity, and gets nothing from its expression as a legal obligation except a penalty for its violation, and the facts of the case reject any charge that it was enforced to the extent of risk of the life of anybody or to the injury of anybody. * * * Rules of conduct must necessarily be expressed in general terms and depend for their application upon circumstances, and the circumstances vary. * * * And what better test could be devised than the doing of 'all in one's power' as determined by the circumstances? The case falls, therefore, under the rule of Nash v. United States, 229 U. S. 373, 57 L. Ed. 1232, 33 Sup. Ct. 780, and not under the rule of International Harvester Co. v. Kentucky," supra.

In Omaechevarria v. Idaho, 246 U. S. 343, 38 Sup. Ct. 323, 62 L. Ed. 763, 769, in error to the Supreme Court of Idaho, the grazing statutes were questioned as denying the rights guaranteed by the Fourteenth Amendment of due process of law, "since it fails to provide for the ascertainment of the boundaries of a 'range,' or for determining what length of time is necessary to constitute a prior occupation, a 'usual' one within the meaning of the act." Mr. Justice Brandeis said:

"Men familiar with range conditions, and desirous of observing the law will have little difficulty in determining what is prohibited by it. Similar expressions are common in the criminal statutes of other states. This statute presents no greater uncertainty or difficulty, in application to necessarily varying facts, than has been repeatedly sanctioned by this court. Nash v. United States, 229 U. S. 373, 377, 57 L. Ed. 1232, 1235, 33 Sup. Ct. Rep. 780; Miller v. Strahl, 239 U. S. 426, 434, 60 L. Ed. 364, 368, 36 Sup. Ct. Rep. 147."

In sustaining the Arizona Employers' Liability Act, Mr. Justice Pitney declared that states are left with a wide range of legislative discretion, notwithstanding the provisions of the Fourteenth Amendment, and their conclusions respecting the wisdom of their legislative acts are not reviewable by the courts. Neither due process of law nor the equal protection of the laws was denied by the statute, which imposed upon employers in respect of certain specified hazardous employments, without regard to the question of their fault, a liability in compensatory damages, to be awarded in a judicial proceeding, according to the ordinary process of law for accidental personal injury or death of an employé arising out of and in the course of the employment, and due to its inherent conditions in cases where such injury or death shall not have been caused by the employé's own negligence. Mr. Justice Holmes, concurring, said:

"There are cases in which even the criminal law requires a man to know facts at his peril. Indeed, the criterion which is thought to be free from constitutional objection, the criterion of fault, is the application of an external standard, the conduct of a prudent man in the known circumstances, that is, in doubtful cases, the opinion of the jury, which the defendant has to satisfy at his peril and which he may miss after giving the matter his best thought. The Germanic [Oceanic Steam Nav. Co. v. Aitken] 196 U. S. 589, 596, 49 L. Ed. 610, 613, 25 Sup. Ct. Rep. 317; Nash v. United States, 229 U. S. 373, 377, 57 L. Ed. 1232, 1235, 33 Sup. Ct. 780; Eastern States Retail Lumber Dealers' Asso. v. United States, 234 U. S. 600, 610, 58 L. Ed. 1490, 1498, L. R. A. 1915A, 788, 34 Sup. Ct. 951; Miller v. Strahl, 239 U. S. 426, 434, 60 L. Ed. 364, 368, 36 Sup. Ct. 147. Without further amplification so much may be taken to be established by the decisions. New York C. R. Co. v. White, 243 U. S. 188, 198, 204, 61 L. Ed. 667, 672, 675, L. R. A. 1917D, 1, 37 Sup. Ct. Rep. 247, Ann. Cas. 1917D, 629, 13 N. C. C. A. 943; Mountain Timber Co. v. Washington, 243 U. S. 219, 336, 61 L. Ed. 685, 695, 37 Sup. Ct. Rep. 260, Ann. Cas. 1917D, 642, 13 N. C. C. A. 927." Arizona Copper Co. v. Hammer, 250 U. S. 400, 39 Sup. Ct. 553, 63 L. Ed. 1058, 1071, 6 A. L. R. 1537.

The federal decisions may be concluded by a reference to the case involving the Emergency Housing Laws for the District of Columbia and that of the Legislature of New York. In Levy Leasing Co. v. Siegel, and 810 West End Ave. v. Stern, 258 U. S. 242, 42 Sup. Ct. 289, 66 L. Ed. ——, in error to the Supreme Court of the state of New York to review a judgment entered pursuant to order of the Court of Appeals of that state, which affirmed an order of the Appellate Division of the Supreme Court, affirming an order of the Special Term of the Supreme Court denying a motion by plaintiff for judgment upon pleading in an action for rent, the insistence is made that the case was ruled by Brown Holding Co. v. Feldman, 256 U. S. 170, 41 Sup. Ct. 465, 65 L. Ed. 877; Block v. Hirsh, supra; that the relation of landlord and ten-

ant is a private one, and is not so affected by a public interest as to render it subject to regulation by the exercise of the police power. Mr. Justice Clarke, delivering the opinion, said of the last-named cases that the emergency declared existed when the acts were passed. The terms of the housing laws were held to meet an emergency designed by the Legislature to promote the health, morality, comfort, and peace of the people of the state, and were declared to be a proper resort to the police power to promote the public welfare; and it was declared that there is no inherent difference in property in land from that in tangible and intangible personal property as exempts it from the operation of the police power in appropriate cases, and that the existing circumstances clothed the letting of buildings for dwelling purposes with a public interest sufficient to justify restricting property rights in them to the extent provided for in the statutes in question.

It should be noted that provisions of the Emergency Housing Laws challenged were:

"It shall be a defense to an action for rent accruing under an agreement for premises in a city," etc., "occupied for dwelling purposes, that such rent is unjust and unreasonable, and that the agreement under which the same is sought to be recovered is oppressive." Chapter 944.

Section 4 of said chapter provides that nothing contained therein shall prevent a plaintiff from pleading and proving in such action a fair and reasonable rent for the premises. Mr. Justice Clarke quotes from the Marcus Brown Co. Case as follows:

"The chief objections to these acts have been dealt with in Block v. Hirsh. In the present case more emphasis is laid upon the impairment of the obligation of the contract of the lessees to surrender possession, and of the new lease, which was to have gone into effect upon October 1, last year. But contracts are made subject to this exercise of the power of the state when otherwise justified, as we have held this to be. Manigault v. Springs, 199 U. S. 473, 480, 50 L. Ed. 274, 277, 26 Sup. Ct. 127; Louisville & N. R. Co. v. Mottley, 219 U. S. 467, 482, 55 L. Ed. 297, 303, 34 L. R. A. (N. S.) 671, 31 Sup. Ct. 265; Chicago & A. R. Co. v. Tranbarger, 238 U. S. 67, 76, 77, 59 L. Ed. 1204, 1210, 1211, 35 Sup. Ct. 678; Union Dry Goods Co. v. Georgia Pub. Service Corp., 248 U. S. 372, 375, 63 L. Ed. 309, 311, 9 A. L. R. 1420, P. U. R. 1919C, 60, 39 Sup. Ct. 117; Producers' Transp. Co. v. Railroad Commission, 251 U. S. 228, 232, 64 L. Ed. 239, 242, P. U. R. 1920C, 574, 40 Sup. Ct. 131."

In Block v. Hirsh, supra, the statute construed Act Cong. Oct. 22, 1919, c. 80, tit. 2, § 109 (41 Stat. at L. 297, 298, 301). That for consideration in Brown Holding Co. v. Feldman, supra was the "Stay Law" of New York (Laws 1920, c. 942, 944, 947), made applicable to cities having a population of a million or more, suspending until November 1, 1922, the right of the landlord to recover possession of real property occupied for dwelling purposes, except where the person holding over is objectionable or where the landlord seeks to occupy the premises as a dwelling for himself and his family, or intends to demolish the building and construct a new one, providing that the tenant or occupant is ready, willing, and able to pay a reasonable rent. Especial emphasis was laid in the latter case: (1) Upon the impairment of the obligation of the contract of the lease to surrender possession. Of this Mr. Justice Holmes observes: "But contracts are made subject to this exercise of the power of the state when otherwise justified," and cites many federal authorities to support the view. And (2) that the laws are discriminating in respect of the cities affected and the character of buildings dealt with. The classification was held to be justified, as the "evil to be met was a very pressing want of shelter in certain crowded centers."

The effect of the decision in Levy Leasing Co. v. Siegel, supra, is that a standard sufficiently definite to satisfy the due process of law clause of the federal Constitution is adopted by the provisions of New York Laws 1920, c. 944, enacted in the exercise of the police power in the emergency growing out of the World War, that it shall be a defense to an action for rent accruing under an agreement for the rental of premises occupied for dwelling purposes that such "rent is unjust and unreasonable, and that the agreement is oppressive, provided, however, that plaintiff may plead and prove in such action a fair and reasonable rent for the premises, and recover judgment therefor." See Wood v. Vogel, 204 Ala. 692, 87 South. 174; Amer. L. Co. v. Zeiss, 219 U. S. 47, 31 Sup. Ct. 200, 55 L. Ed. 82; Gormley v. Clark, 134 U. S. 338, 10 Sup. Ct. 554, 33 L. Ed. 909.

The foregoing will suffice to show the validity of the Alabama statute, without reference to other statutes that have been sustained by state and federal courts, where tests have been supplied by reference to rates fixed by public service commissions or other governmental agencies under delegated legislative discretion or administrative powers, furnishing abundant examples. Johnson v. Craft, supra; Whaley v. State, 168 Ala. 152, 52 South. 941, 30 L. R. A. (N. S.) 499.

If the test declared by the Kentucky statute—"of the market value under *fair competition* and under *normal market conditions*"—had been merely "the market value" without regard to *unfair competition* and *abnormal conditions of the market*, we apprehend the statute would not have been declared offensive to the due process clause of the Fourteenth Amendment. The Alabama statute declares the test as being a due regard to the cost price in relation to the market value, and not, as did the Kentucky statute, "the

market value *under fair competition* and *under normal market conditions*." That is to say, the foregoing are the respective tests in the two states for the ascertainment or declaration of whether or not the acts condemned by the two statutes were a cheat or fraud.

To determine his conduct, according to the circumstances and actualities of life, or by reference to "knowable criteria" (using the language of the Supreme Court of the United States), the defendant was not required by the Alabama statute, at the time of the commission of the act on which the indictment is rested, to speculate upon imaginary conditions, the value under "normal market conditions" and "fair competition," or of the "real value" after eliminating abnormal influences of combinations to affect the price. He was only required to look to the cost price of the necessity to him as related to the cost price of such article or commodity on the market at the time of the sale or offer of sale. When so doing he ascertained, or may have done so, his good faith or his culpability—between the "two extremes of the obviously illegal and the plainly lawful"—and he was thus informed of his general duty in the matter to himself and to the purchaser as a member of the general public. The conditions thus imposed by a state statute on a person, as stated in Internl. H. Co. v. Kentucky, supra, "are as permanent as anything human, and a great body of precedents" heretofore cited from our statutes. When these conditions are coupled with familiar practices, it is made "comparatively easy" by the exercise of common sense and common honesty for any and every person to keep to what is safe and to avoid what is a fraud or cheat upon his customer as a member of the general public whose welfare is sought to be conserved by the police regulation in question.

It follows from the foregoing that section 2 of the Alabama statute is not offensive to any of the provisions of the Fourteenth Amendment to the Constitution of the United States, is within the police power of state government, enabling defendant to know and to demand the nature and cause of the accusation for a crime ascertained by law, does not deprive any person of his property except by due process of law, and impairs no obligation of contract. Const. Ala. §§ 6, 7, 22; Singer S. M. Co. v. Brickell, 233 U. S. 304, 34 Sup. Ct. 493, 58 L. Ed. 974.

The discussion may be closed with the observation that it is a general rule of construction, followed by the Supreme Court of the United States, that statutes should be construed fairly in such a way as to avoid doubtful constitutional questions; and it is to be presumed that state laws will be construed in that way by the state courts. U. S. ex rel. Atty. Gen. v. D. & H. Co., 213 U. S. 366, 407, 408, 29 Sup. Ct. 527, 53 L. Ed. 836; Fox v. Washington, supra. When the Alabama statute is construed by this court as confined to the preventation of frauds and cheats, the insistence that the act is both an unjustifiable restriction of the use and right of property and too vague for a criminal law must fail. Fraudulent intent is a mere condition of the mind, and constitutes an ultimate fact in the definition of any offense of which it is made an ingredient. 16 Ann. Cas. 1231, and authorities.

This is aside from the rule that if a statute is fairly susceptible of two constructions, we should adopt that which will uphold the statute, even though it be the less natural. Quartlebaum v. State, 79 Ala. 1, 3; State ex rel. Collman v. Pitts, 160 Ala. 133, 146, 41 South. 441, 686, 135 Am. St. Rep. 79. See authorities collected in Williams v. Schwarz, 197 Ala. 40, 46, 72 South. 330, Ann. Cas. 1918D, 869; Dartmouth College v. Woodward, 4 Wheat. 518, 625, 4 L. Ed. 629; Fletcher v. Peck, 6 Cranch, 87, 3 L. Ed. 162; Sweet v. Rechel, 159 U. S. 380, 393, 16 Sup. Ct. 43, 40 L. Ed. 188. We have indicated the duty to follow the natural construction to which the statute is fairly susceptible to declare the legislative will in its enactment to prevent frauds and cheats.

We may conclude the matter by saying it must be conceded that the Legislature of any state may enact a statute providing that proof of one fact shall constitute prima facie evidence of another related fact. Adams v. New York, 192 U. S. 585, 588, 24 Sup. Ct. 372, 48 L. Ed. 575. That is to say, the facts so employed in establishing presumptions declaring the burden of proof, or evidentiary of another fact, must be related. Bailey v. Alabama, 219 U. S. 219, 31 Sup. Ct. 145, 55 L. Ed. 191; McFarland v. Amer. Sugar Ref. Co., 241 U. S. 79, 36 Sup. Ct. 498, 60 L. Ed. 899. The related evidentiary facts, or presumptions to be drawn therefrom, employed in declaring rules respecting the burden of proof or by which the same may be respectively discharged, are clearly within the legislative powers of the state governments (Hawkins v. Bleakly, 243 U. S. 210, 214, 37 Sup. Ct. 255, 61 L. Ed. 678, Ann. Cas. 1917D, 637); and a provision so employed in a state statute, "not unreasonable in itself and not conclusive of the rights of the party, does not constitute a denial of due process of law" (Mobile, J. & K. C. R. Co. v. Turnipseed, 219 U. S. 35, 42, 31 Sup. Ct. 136, 55 L. Ed. 78, 32 L. R. A. [N. S.] 226, Ann. Cas. 1912A, 463; Hawes v. Georgia, 258 U. S. 1, 42 Sup. Ct. 204, 66 L. Ed. ——). The related facts employed in the Alabama statute for construction are, on the one hand, the price at which the defendant sells or attempts to sell the article, commodity, or necessity of life, and, on the other, its cost price to the person selling or offering the same for sale and the cost price on the market of articles, commodities, or necessities of like kind or character. Such facts tending to show value are reasonably related and not conclu-

·sive of the rights of the party; and the reasonable presumptions raised or which may be drawn from such related facts are such as are within the rules of disputable presumptions permitted and defined by the decisions of the Supreme Court of the United States. Bailey v. Alabama, supra; McFarland v. Amer. Sugar Ref. Co., supra. The part of the statute for construction is free from constitutional objection.